913 So.2d 43 (2005)
Robert B. JENKINS d/b/a Sandhill Developments, Appellant,
v.
ECKERD CORPORATION, Appellee.
No. 1D04-0370.
District Court of Appeal of Florida, First District.
September 28, 2005.
*46 William E. Bond, Jr., and Keith L. Bell, Jr., of Clark, Partington, Hart, Larry, Bond & Stackhouse, Pensacola, for Appellant.
Celeste D. Flippen of J.C. Penney Company, Inc., Plano, TX, and Stephen H. Grimes and Susan L. Kelsey of Holland & Knight LLP, Tallahassee, for Appellee.
VAN NORTWICK, J.
Robert B. Jenkins, doing business as Sandhill Developments (Sandhill or lessor), appeals a final judgment entered following the granting of a directed verdict in favor of Eckerd Corporation (Eckerd or lessee), appellee, in an action filed by Sandhill for damages resulting from an alleged breach of a shopping center lease by Eckerd. We conclude that the lower court correctly determined that the parties' lease was free from any latent ambiguity that would permit the introduction of extrinsic evidence and that, under the unambiguous provisions of the lease, Eckerd possessed the right to terminate its obligations under the lease when the anchor tenant, Delchamps, Inc., ceased to lease and pay rent for its store in the shopping center. Accordingly, we affirm the judgment entered in favor of Eckerd.

Factual and Procedural Background
The heart of this controversy concerns language used in a shopping center lease. In January 1991, Sandhill and K & B Florida Corporation (K & B), a pharmaceutical retailer, entered into the subject lease (K & B Lease) providing for the rental of a parcel of real property located in the Gulf Breeze Shopping Center in Gulf Breeze, Florida. Shortly before the execution of the K & B Lease, Sandhill had leased space in the shopping center to Delchamps, Inc., a regional supermarket chain, as a so-called "anchor" tenant in the shopping center. Article 2B of the K & B Lease referred to the Delchamps lease and provided, in pertinent part, as follows:

*47 ARTICLE 2

* * * * * *
B. Lessor represents to Lessee that Lessor has entered into leases with the following named concerns: with Delchamps, Inc. (Delchamps) for a minimum of 45,000 square feet for supermarket grocery store and that Lessor will construct and offer for lease individual retail shops for a minimum of 21,000 square feet for various retail uses, all located and dimensioned shown on the attached Plot Plan, ... Lessor further represents that said Delchamps lease is for leasing and paying rent by Delchamps as designated hereinabove in the Shopping Center, all as shown on the Plot Plan, Exhibit "A", the lease to Delchamps being for a minimum period of 20 years, and said lease obligates Delchamps to initially open for business in the Shopping Center for the use as indicated above and to lease and pay rent for their store substantially to the same extent as is required of Lessee; that Delchamps has not been granted any right or privilege of terminating such lease during the primary 20 year term thereof under any circumstances more favorable to Delchamps than those granted to Lessee herein. The continued leasing and payment of rent for their store in the Shopping Center by Delchamps is part of the consideration to induce Lessee to lease and pay rent for its store, as hereinafter described on the Leased Premises as a part of the Shopping Center. Accordingly, should Delchamps fail or cease to lease and pay rent for its store in the Shopping Center during the Lease Term as hereinafter set out, Lessee shall have the right and privilege of: (a) cancelling this Lease and of terminating all of its obligations hereunder at any time thereafter upon written notice by Lessee to Lessor, and such cancellation and termination shall be effective ninety (90) days after the mailing of such written notice;... It is specifically understood that Lessor shall be obligated to immediately notify Lessee in writing should Delchamps fail or cease to lease and pay rent for such a store in the Shopping Center during the primary term of this Lease, but any failure of Lessor to notify Lessee thereof shall in no way deprive Lessee of its privilege of cancelling this Lease and terminating all of its obligation hereunder.
(Emphasis added).
Article 29A of the K & B Lease contained an integration clause which provided that "[t]his lease contains all of the agreements made between the parties hereto and may not be modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their heirs, legal representatives, successors, transferees, or assigns." The Delchamps lease included an assignment provision which granted Delchamps "the right, at any time after the commencement of the term hereof, to assign this lease...."
In August 1997, Rite Aid, Incorporated (Rite Aid), another drugstore operator, acquired K & B and continued to operate the drugstore in the shopping center under the K & B Lease as a Rite Aid store. In September 1997, Jitney Jungle Stores of America, Inc. (Jitney Jungle), another grocery store operator, acquired the capital stock of Delchamps and continued the operation of the Delchamps grocery store in the shopping center. In 1998, Eckerd acquired certain drugstore properties from Rite Aid, including the drugstore in the shopping center. The K & B Lease was assigned to Eckerd, which began operating an Eckerd drugstore in the leased premises. In October 1999, Jitney Jungle, and *48 its affiliates, including Delchamps, filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code. Thereafter, an order was entered in the bankruptcy proceeding approving Delchamps' assignment of its lease in the shopping center to Bruno's Supermarkets, Inc. (Bruno's). Since the assignment, Bruno's has occupied the leased premises under the assigned Delchamps lease and has operated a Bruno's grocery store there. Sandhill failed to provide notice to, or obtain consent from, Eckerd of this assignment.
On June 14, 2001, Eckerd notified Sandhill that Eckerd intended to close the drugstore it operated in the leased premises and that it had retained the services of an agent to locate a suitable subtenant for the space. Eckerd indicated that its agent would be available to negotiate should Sandhill be interested in early termination of the lease. On June 22, 2001, Eckerd notified Sandhill that, because Delchamps had ceased to lease and pay rent for its store in the shopping center, pursuant to article 2B of the K & B Lease, Eckerd was cancelling its lease effective September 20, 2001. Eckerd continued to pay rent due under the lease through October 2001.
In December 2001, Sandhill filed suit against Eckerd for an alleged breach of the shopping center lease, seeking damages for rent, taxes, and common-area maintenance (CAM) charges for the period of November 2001 to the date of trial. In its answer, Eckerd alleged that it terminated its lease obligations pursuant to article 2B of the lease promptly upon learning that Delchamps no longer leased the grocery store in the Gulf Breeze Shopping Center. Eckerd counterclaimed for return of rent and CAM charges it paid to Sandhill for the period of July 2001 through October 2001. The case proceeded to nonjury trial.
At trial, Sandhill sought to introduce testimony relating to its negotiations of the K & B Lease to explain the parties' intent in drafting the allegedly ambiguous language of article 2B. The trial court sustained Eckerd's parol evidence and relevancy objections to the admission of extrinsic evidence pertaining to the parties' intent when entering into the original agreement. Sandhill then proffered testimony of a real estate developer who was involved in the 1991 lease negotiations between K & B and Sandhill.
The developer testified that prior to the mid-1980s, as a general rule, anchor tenants had agreed to operating covenants which obligated the tenant to continue operation of the store during the entire lease term. By the mid-1980s, however, most anchor tenants had refused to sign operating covenants. Rather than agree to operate continuously, anchor tenants agreed to pay rent as the fulfillment of their lease obligation, even if they ceased operation.
Sandhill also proffered the testimony of Virginia Besthoff, who negotiated the subject lease on behalf of K & B, and Mr. Jenkins who negotiated the lease on behalf of Sandhill. Besthoff testified that the purpose of article 2B
was to protect us as the tenants from being in a shopping center where we did not have a co-anchor operating the shopping center with us, to help attract traffic to the center, and to pay rent to the landlord, which would result in the landlord not keeping the center maintained, and we felt that that was very important for us to have a driving, busy shopping center.
On cross-examination of Besthoff, the following ensued:
Q. ... Now, typically when you negotiate that provision [article 2B], does the landlord ask that you include language *49 that broadens the definition of the cotenant beyond the mere name to Delchamps?
A. Frequently.
* * * * * *
Q. Frequently the landlord will say, Ms. Besthoff, after the word Delchamps in 2(b), we want to insert, or successors and assigns; isn't that right?
A. That's absolutely accurate.
Q. And that didn't happen in this case, did it?
A. No.
Q. And therefore, the wording was just as it appears today?
A. Yes.
Jenkins' proffered testimony that his family had owned the Gulf Breeze Shopping Center since 1969 and had leased premises to Delchamps under a lease with a continuous occupancy clause. When Jenkins' family expanded the shopping center and built Delchamps a new store, Delchamps refused to agree to a continuous occupancy clause in the new lease. Delchamps indicated that under any new lease it would reserve the right to not continuously operate and to "go dark." Jenkins explained the intent of article 2B in the K & B Lease as follows:
It was basically a provision that we gave K & B to give them some assurance that even though we knew Delchamps had the capability now to go dark, that Delchamps and I would be financially motivated to get a replacement tenant and put another grocery store in the shopping center, which is what was the most beneficial thing to K & B. . . . Delchamps is a much bigger operation than I am, so their ability to pull in a new grocery store was even better than mine as a landlord. . . .
Jenkins further testified that the parties intended that Delchamps "would be absolutely on the hook" for rent so that they would assign the lease rather than go dark and cease their operations.
At the close of Sandhill's case, Eckerd moved for, and the trial court granted, a directed verdict in favor of Eckerd. The trial court ruled:
I am going to grant the motion for a directed verdict. I think the language of the lease speaks for itself ... It's not ambiguous. It's probably very fortuitous for Eckerd that it coincided with the time they were moving down the highway, but I don't think that it has a valid reason not to enforce the terms of the language of the lease as it's written. So I am going to grant the motion for directed verdict in favor of Eckerd. A judgment will be for Eckerd.
The trial court also awarded Eckerd $16,026.04 in damages reflecting the amount of rent payments made by Eckerd for the period from September 20, 2001, to October 31, 2001. This appeal ensued.

Standard of Review
Two standards of review are applicable in our review of this appeal. The trial court's interpretation of the contract is a matter of law subject to a de novo standard of review. See Leisure Resorts, Inc. v. City of W. Palm Beach, 864 So.2d 1163, 1166 (Fla. 4th DCA 2003); Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 876 n. 2 (Fla. 4th DCA 2002); Steuart Petroleum Co. v. Certain Underwriters of Lloyd's London, 696 So.2d 376, 379 (Fla. 1st DCA 1997). As to the admissibility of parole evidence, a trial court enjoys broad discretion in matters relating to the admissibility of relevant evidence, and a ruling in such regard will not be overturned absent a clear abuse of discretion. See Castillo v. E.I. Du Pont De Nemours & Co., Inc., 854 So.2d 1264, 1280 (Fla.2003) (citing Grau v. Branham, 761 *50 So.2d 375 (Fla. 4th DCA 2000)); Forester v. Norman Roger Jewell & Brooks Int'l, Inc., 610 So.2d 1369, 1372 (Fla. 1st DCA 1992).

Analysis
The specific language in the K & B Lease at issue provides that
should Delchamps fail or cease to lease and pay rent for its store in the Shopping Center ... Lessee shall have the right and privilege of: (a) canceling this lease and of terminating all of its obligation hereunder at any time thereafter upon written notice by Lessee or Lessor....
It is a fundamental rule of contract interpretation that a contract which is clear, complete, and unambiguous does not require judicial construction. See Hunt v. First Nat'l Bank of Tampa, 381 So.2d 1194, 1197 (Fla. 2d DCA 1980). See also Dolphins Plus, Inc. v. Hobdy, 650 So.2d 213, 214 (Fla. 3d DCA 1995); Med. Ctr. Health Plan v. Brick, 572 So.2d 548, 551 (Fla. 1st DCA 1990); Neisner Bros., Inc. v. Palm Corp., 394 So.2d 1106, 1107 (Fla. 3d DCA 1981); Saltzman v. Ahern, 306 So.2d 537, 539 (Fla. 1st DCA 1975). This rule applies to commercial leases as any other contract. See, e.g., Neisner Bros., 394 So.2d at 1107.

Delchamps Includes "Its Successors or Assigns"
Sandhill argues that the term "Delchamps" in the K & B Lease must be read to include "and its successors or assigns" for three separate reasons. We will address each argument in turn.
Under Florida law, contracts are assignable unless assignment is specifically prohibited, the contract involves obligations of a personal nature, or public policy prohibits assignment. See L.V. McClendon Kennels, Inc. v. Investment Corp. of South Florida, 490 So.2d 1374, 1375 (Fla. 3d DCA 1986). Sandhill asserts that, since the Delchamps Lease was assignable, the term "Delchamps" in article 2B of the K & B Lease should be interpreted to include its successors or assigns to be consistent with Florida law. If the K & B Lease is not interpreted in this manner, Sandhill argues that the K & B Lease, in effect, will restrict the assignment of the Delchamps lease.
Nothing in the K & B Lease, however, prohibits or restricts the assignment of the Delchamps lease. Article 2B of the K & B Lease simply grants to the lessee the right to terminate the lease if Delchamps ceases to lease and pay rent in the shopping center. If Sandhill wished to avoid the risk of the lessee terminating its lease upon Delchamps assigning its lease, Sandhill could have done so by obtaining Eckerd's consent to the assignment.
Alternatively, Sandhill contends that provisions of the United States Bankruptcy Code require Florida courts to interpret "Delchamps" to include "its successors and assigns." The Code allows a debtor-in-possession or bankruptcy trustee to assume an unexpired lease so long as any default under the lease is cured, 11 U.S.C. § 365 (2003), and after assumption, the trustee may assign the lease to a third party for the benefit of the estate. Id. The record reflects that, as debtor-in-possession during its reorganization under chapter 11 of the Code, Delchamps assumed the Delchamps lease and assigned it to Bruno's. Sandhill was contractually bound to Bruno's pursuant to the assignment by operation of the bankruptcy law. See American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80-83 (3d Cir.1999). Sandhill argues that to interpret the K & B Lease to allow the assignment in bankruptcy to trigger a *51 right of termination by Eckerd would be contrary to the intent of the bankruptcy law. Thus, Sandhill submits, as a matter of federal law, "Delchamps" must be read to implicitly include "and/or its assigns." We cannot agree. Sandhill cites no authority for this argument and our research has revealed none. As stated above, the K & B Lease does not prohibit or restrict the assignment of the Delchamps lease. Further, the unambiguous language of the K & B Lease provides for the lessee's right of termination.
Thirdly, Sandhill submits that, since the K & B Lease refers to the Delchamps lease, the terms of the Delchamps lease must be deemed to be incorporated by reference into the K & B Lease. Thus, Sandhill argues, the reference to the Delchamps lease in the K & B Lease required the trial court to interpret the K & B Lease to allow for the assignment without triggering Eckerd's termination right. Again, we cannot agree with Sandhill's argument.
Certainly, under Florida law, "[w]here a written contract refers to and sufficiently describes another document, that other document or so much of it as is referred to, may be regarded as part of the contract and therefore is properly considered in its interpretation." Hurwitz v. C.G.J. Corp., 168 So.2d 84 (Fla. 3d DCA 1964)(quoting Collins v. Nat'l Fire Ins. Co. of Hartford, 105 So.2d 190 (Fla. 2d DCA 1958)). Incorporation by reference, however, requires more than simply making reference to another document in a contract. As we explained in Management Computer Controls, Inc. v. Charles Perry Construction, Inc., 743 So.2d 627, 631 (Fla. 1st DCA 1999):
A document may be incorporated by reference in a contract if the contract specifically describes the document and expresses the parties' intent to be bound by its terms. The contract must contain more than a mere reference to the collateral document, but it need not state that it is "subject to" the provisions of the collateral document to incorporate its terms. It is sufficient if the general language of the incorporating clause reveals an intent to be bound by the terms of the collateral document.
(Citations omitted). Although the K & B Lease does refer to the Delchamps Lease, the K & B Lease contains no language which indicates an intent to be bound by the terms of the Delchamps lease or to make its terms a part of the K & B Lease. Thus, the terms of the Delchamps Lease have not been incorporated by reference into the K & B Lease.
In the case on appeal, the trial court concluded, and we agree, that article 2B of the K & B Lease clearly and unambiguously gave the lessee the option to cancel the lease if Delchamps ceased to lease and pay rent for the use of its store. As is clear from article 2B itself, the subject language was an inducement for the drugstore tenant to lease in the shopping center. Compare Winn-Dixie Charlotte, Inc. v. Brunner Companies Income Properties Limited Partnership I, 245 Ga.App. 672, 538 S.E.2d 152, 153-54 (2000). Such provisions are not uncommon in commercial leases. See, e.g., Stuart M. Saft, 3 Commercial Real Estate Forms, 3d § 13:11 (West 2001)("Occasionally, the anchor tenants will retain the right to terminate their leases if ... another anchor tenant terminates its lease...."). Here, the contingency in article 2B occurred and the lessee elected to exercise its right of termination. Because of the explicit language in article 2B, the trial court correctly applied the contractual terms and refused to permit parol evidence, which, if admitted, may have altered the terms of the lease.
*52 Sandhill, in effect, seeks to have this court rewrite the express language of article 2B by inserting "its successors or assigns." Sandhill would have the subject sentence read: "Accordingly, should Delchamps [, its successors or assigns,] fail or cease to lease and pay rent for its store in the Shopping Center . . . , Lessee shall have the right and privilege of: (a) cancelling this Lease...." But even if we were inclined to rewrite this lease, why would the language preferred by Sandhill be our only drafting option? For example, why should the drugstore tenant be required to accept any successor or assign to Delchamps? It would be equally as logical to rewrite the lease to require that any successor or assign be a regional or national operator of supermarkets at least as large as Delchamps or to give the lessee the right to approve any successor or assign. Alternatively, if we were to undertake rewriting article 2B of the lease, should we add a provision for liquidated damages, in lieu of the harsh remedy of termination, as suggested by one commentator? See Charles Tiefer, Forfeiture by Cancellation or Termination, 54 Mercer L.Rev. 1031, 1079-80 (2003). It is the obligation and right of the parties to negotiate and draft the provisions of the lease, not a court. This is not a case in which the parties possessed unequal bargaining positions, allowing the more powerful party to impose a harsh term on the weaker party. See Samuel Issacharoff, Contracting for Employment: The Limited Return of the Common Law, 74 Tex. L.Rev. 1783, 1788 (1996)("[C]haracteristic indicators of impediments to full and equal bargaining [are]: significant disparities in bargaining power between offeror and offeree; contracts of adhesion drafted by the offeror; asymmetries in the ability to breach the contractual guarantee of security; and the inability to seek a market remedy in the event of a breach."). The contracting parties here had the ability to negotiate and establish, as of the effective date of the lease, their respective rights, duties and remedies for the entire term of the lease and to express those rights and duties in writing as accurately as feasible. As the court explained in Emergency Associates of Tampa, P.A. v. Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995):
[W]hen the terms of a voluntary contract are clear and unambiguous, as here, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.
(Citing Medical Ctr. Health Plan v. Brick, 572 So.2d 548 (Fla. 1st DCA 1990)); see also Neisner Bros., 394 So.2d at 1107. Although the remedy of termination provided by article 2B may be harsh, it is the remedy that the parties negotiated and expressly set forth in writing.

Extrinsic Evidence
Sandhill argues that the trial court erred in applying the parol evidence rule and refusing to allow the introduction of extrinsic evidence in interpreting article 2B of the K & B Lease. Sandhill correctly acknowledges that, if a contract provision is "clear and unambiguous," a court may not consider extrinsic or "parol" evidence to change the plain meaning set forth in the contract. Quarterman v. City of Jacksonville, 347 So.2d 1036, 1041 (Fla. 1st DCA 1977). Sandhill contends that parol evidence was admissible below since the lease is incomplete and contains a latent ambiguity. RX Solutions, Inc. v. Express Pharmacy Servs., Inc., 746 So.2d 475, 476 (Fla. 2d DCA 1999); Hunt v. First Nat'l Bank of Tampa, 381 So.2d 1194, 1197 (Fla. 2d DCA 1980). A latent ambiguity arises when a contract on its face appears clear and unambiguous, but fails to specify the *53 rights or duties of the parties in certain situations. Bayco Dev. Co. v. Bay Med. Ctr., 832 So.2d 921, 922 (Fla. 1st DCA 2002). Sandhill submits that, while the reference in article 2B of the K & B Lease to the Delchamps lease may be "unambiguous" when read literally, this reference was not "clear" or "complete" with regard to the operation of the lease should the Delchamps lease be assigned. We cannot agree.
The operation of the parol evidence rule encourages parties to embody their complete agreement in a written contract and fosters reliance upon the written contract. "The parol evidence rule serves as a shield to protect a valid, complete and unambiguous written instrument from any verbal assault that would contradict, add to, or subtract from it, or affect its construction." Sears v. James Talcott, Inc., 174 So.2d 776, 778 (Fla. 2d DCA 1965). The parol evidence rule presumes that the written agreement that is sought to be modified or explained is an integrated agreement; that is, it represents the complete and exclusive instrument setting forth the parties' intended agreement. Gulf Atlantic Towing Corp. v. Dickerson, Inc., 271 F.2d 542, 546 (5th Cir.1959)(For the parol evidence rule to apply, "the written agreement must appear on its face to express an agreement complete in all essential terms.")(quotation and citations omitted). The concept of integration is based on a presumption that the parties to a written contract intended that writing "to be the sole expositor of their agreement." Everglade Lumber Co. v. Nettleton Lumber Co., 111 Fla. 333, 149 So. 736, 738 (1933). The terms of an integrated written contract can be varied by extrinsic evidence only to the extent that the terms are ambiguous and are given meaning by the extrinsic evidence. Avis Rent A Car Sys., Inc. v. Monroe County, 660 So.2d 413 (Fla. 3d DCA 1995).
Here, article 29A of the K & B Lease contains a so-called merger or integration clause.[1] Although the existence of a merger clause does not per se establish that the integration of the agreement is total, see Bird Lakes Dev. Corp. v. Meruelo, 626 So.2d 234, 238 (Fla. 3d DCA 1993), a merger clause is a highly persuasive statement that the parties intended the agreement to be totally integrated and generally works to prevent a party from introducing parol evidence to vary or contradict the written terms. See Restatement (Second) of Contracts § 216, comment e (A merger clause "is likely to conclude the issue whether the agreement is completely integrated. Consistent additional terms may then be excluded even though their omission would have been natural in the absence of such a clause."). Here, we find that the K & B Lease is an integrated agreement complete in all essential terms.
Further, Article 2B is not in the least unclear or incomplete. It contains no latent or patent ambiguity. Although article 2B does not mention assignment by Delchamps, it unambiguously grants the lessee the right to terminate the K & B Lease if Delchamps ceases to lease and pay rent for its store in the shopping center for any reason. We find Sassano instructive. 664 So.2d at 1002. In Sassano, the appellate court examined a provision in a noncompete agreement which prevented a party from setting up a competing medical practice within "five (5) *54 square miles" of the existing practice that was being purchased. Id. The trial court had ruled that "five (5) square miles" was ambiguous, then allowed the introduction of extrinsic evidence to the effect that the parties' true intent was to establish a noncompete area of a five-mile radius from the existing practice. Id. at 1001. The appellate court reversed the trial court's decision to admit extrinsic evidence, holding that the provision was clear and unambiguous and, thus, that the plain language controlled. Id. at 1003 ("In this case, we can discern no uncertainty of meaning in the phrase `five (5) square miles' used by the parties on the face of their agreement such that this phrase is latently ambiguous."). Like the "five (5) square miles" provision in Sassano, the termination right in article 2B is unambiguous. Accordingly, the trial court correctly ruled that it could not admit extrinsic evidence.

Non-Material Breach and Forfeiture
Sandhill also argues that the trial court erred in allowing Eckerd to enforce its termination right because, submits Sandhill, the termination clause was an immaterial provision of the lease and the breach of an immaterial provision is not a breach that entitles the non-breaching party to the remedy of termination. We do not find the lessee's conditional right of termination to be immaterial. It was a provision specifically negotiated by the parties to induce the lessee to lease the premises and operate a drugstore. If a court were to excuse the nonoccurrence of this condition, Eckerd would be deprived of the benefit of this express contractual provision. See Restatement (Second) of Contracts § 241, comment b (1981)("[A]n important circumstance in determining whether a failure is material is the extent to which the injured party will be deprived of the benefit which he reasonably expected from the exchange.").
Further, Sandhill contends that enforcement of article 2B should be excused because enforcement of the provision will result in an improper forfeiture. Even if we were to agree that the operation of article 2B constituted a forfeiture, while forfeitures are not favored under Florida law, the law allows for parties to make contracts that will result in forfeiture "`and when it is clear from the terms of the contract that the parties have so agreed, a court of law as well as the court of equity, will enforce the forfeiture.'" Nelson v. Hansard, 143 Fla. 898, 899-900, 197 So. 513, 514 (1940)(quoting 12 Am.Jur. page 1015, section 435); see also Restatement (Second) of Contracts § 227 comment b ("[T]he policy favoring freedom of contract requires that, within broad limits (see § 229), the agreement of the parties should be honored even though forfeiture results."). Under section 229 of the Restatement (Second) of Contracts, a court may excuse the non-occurrence of a condition which would cause a disproportionate forfeiture, but not where the occurrence of the condition was a material part of the contract.[2] Thus, "if the term that requires the occurrence of the event as a condition is expressed in unmistakable language, the possibility of forfeiture will not affect the interpretation of that language." Id. at § 229 comment a. Here, in article 2B the parties acknowledge that Delchamps' presence in the shopping center was an inducement for the drugstore lessee to lease space and have expressly and unambiguously *55 provided for the lessee's right of termination.
The case on appeal involves the unilateral termination of a lease upon the occurrence of a condition expressly provided for in the lease. Florida courts have long upheld contractual provisions granting one party the unilateral termination rights if supported by consideration. See Avatar Dev. Corp. v. De Pani Constr., Inc., 834 So.2d 873, 875 (Fla. 4th DCA 2002); Sugar Cane Growers Co-op. of Fla., Inc. v. Pinnock, 735 So.2d 530, 537-38 (Fla. 4th DCA 1999). Here, sufficient consideration is present. See id. Further, this is not a case in which the parties possessed unequal bargaining positions, allowing the more powerful party to impose a harsh term on the weaker party; a case in which unaccounted for events occurred; or a case in which the termination remedy was not expressly provided. Here, parties of equal bargaining power expressly exercised their freedom of contract to provide for a termination remedy if the supermarket anchor tenant, Delchamps, ceased to lease and pay rent in the shopping center. The language of the lease which is the subject of this action is clear and unambiguous and we have no authority to rewrite it.
AFFIRMED.
KAHN, C.J., concurs and ERVIN, J., dissents with written opinion.
ERVIN, J., dissenting.
The issue before the trial court was whether the lease between Sandhill and Eckerd authorized Eckerd to cancel its lease if Delchamps ceased to lease and pay rent in the shopping center. The majority concludes the trial court acted properly in excluding extrinsic evidence as to the parties' intent at the time they entered into the original lease, and in finding the lease to be free of ambiguity; therefore, Eckerd was authorized to cancel before the expiration date of the lease. For the reasons which follow, I am unable to agree with the majority's decision to affirm.
A well-recognized exception to the general rule that a contract which is clear and unambiguous does not require judicial construction is where
"a contract fails to specify the rights or duties of the parties under certain conditions or in certain situations, then the occurrence of such condition or situation reveals an insufficiency in the contract not apparent from the face of the document. This insufficiency is called a latent ambiguity, and ... courts ... are frequently called upon to determine what the parties would have included in their contract had they anticipated an occurrence which they in fact overlooked.. . . In so doing, the function of the court is to ascertain, insofar as possible, the intent of the parties. . . . Extrinsic evidence is not only admissible on that issue, but is frequently required where the instrument itself does not provide sufficient insight into intent."
Centennial Mortgage, Inc. v. SG/SC, Ltd., 772 So.2d 564, 565 (Fla. 1st DCA 2000) (quoting Hunt v. First Nat'l Bank of Tampa, 381 So.2d 1194, 1197 (Fla. 2d DCA 1980)). Accord Bayco Dev. Co. v. Bay Med. Ctr., 832 So.2d 921, 922 (Fla. 1st DCA 2002). Moreover, "[w]henever a party presents an arguable claim that a document contains a latent ambiguity, the court is obliged to consider the extrinsic evidence, at least to the extent necessary to determine whether the claimed latent ambiguity actually exists." Bd. of Trs. of the Internal Improvement Trust Fund v. Lost Tree Vill. Corp., 805 So.2d 22, 26 (Fla. 4th DCA 2001).
"The existence of an ambiguity in a contract is a question of law, therefore our review is de novo." Bayco Dev. Co., 832 *56 So.2d at 922 n. 2. See also Centennial Mortgage, 772 So.2d at 565-66. Parol evidence is admissible to resolve latent ambiguities. See id. at 565. In Centennial, the court noted the modern trend with respect to parol evidence "`is for the courts to allow parol evidence, even in cases where a contract contains an integration clause, in order ... to explain an ambiguity in the contract.'" Id. (quoting Outlaw v. McMichael, 397 So.2d 1009, 1011 (Fla. 1st DCA 1981)).
Silence can create a latent ambiguity in some circumstances. See S. Crane Rentals v. City of Gainesville, 429 So.2d 771, 773 (Fla. 1st DCA 1983); Hunt v. First Nat'l Bank of Tampa, 381 So.2d 1194 (Fla. 2d DCA 1980). Extrinsic evidence is properly admitted "when the language of a contract does not deal in express terms with all aspects of the rights and duties of the parties to the agreement." Cox v. CSX Intermodal, Inc., 732 So.2d 1092, 1096 (Fla. 1st DCA 1999). See also NCP Lake Power, Inc. v. Fla. Power Corp., 781 So.2d 531, 537 (Fla. 5th DCA 2001). When the contract contains a latent ambiguity, the court's function is to ascertain the parties' intent at the time of making the contract, insofar as it is possible to do. See Hunt, 381 So.2d at 1197.
Here, the issue is whether the assignment of the Delchamps lease triggered Eckerd's right to terminate the lease. It is undisputed that the Eckerd lease included language which provided that if Delchamps should fail to lease and pay rent in the Gulf Breeze Shopping Center, Eckerd had the right to cancel its lease with appellant upon written notice. Significantly, the Eckerd lease is silent in regard to Eckerd's rights and duties in the event Delchamps assigned its lease to another grocer under the same terms and conditions as those provided in the Delchamps lease. Because the Delchamps lease included an express right of assignment, and the Eckerd lease referred to both that lease and Delchamps' continued obligation to lease and pay rent as part of Eckerd's consideration for entering into the lease,[3] I conclude the Eckerd lease must be construed as incorporating both the Delchamps lease and its assignment provision. See Mgmt. Computer Controls, Inc. v. Charles Perry Constr., Inc., 743 So.2d 627, 631 (Fla. 1st DCA 1999); Computer Sales Int'l, Inc. v. State Dep't of Revenue, 656 So.2d 1382, 1384 (Fla. 1st DCA 1995).
In my opinion, the Eckerd lease contains a latent ambiguity within the contemplation of Bayco Development Co., 832 So.2d at 922, wherein this court stated: "If a contract fails to specify the rights or duties of the parties under certain conditions or in certain situations, then the occurrence of such condition or situation reveals an insufficiency in the contract not apparent from the face of the document." I conclude therefore the trial court erred in failing to recognize a latent ambiguity in the Eckerd contract, and in failing to consider the proffered evidence concerning the parties' intent as to the relationship between the Delchamps and Eckerd leases. That evidence established that at the *57 inception of the relationship between K & B and the shopping center owner, Delchamps, a grocer, was considered to be the "anchor" store that would enhance the value of the drug store lease. The "lease and pay rent" provision was included to keep Delchamps "on the hook" for its share of the common-area maintenance (CAM), and to motivate Delchamps to locate a suitable tenant if it should vacate the premises. The benefit to Eckerd was the continuation of an "anchor" store in the shopping center, not that the anchor store should be Delchamps, and no other.[4] Thus, Eckerd clearly received its contractual consideration under the lease provision that an "anchor" grocer would continue to lease and pay rent in the shopping center. Because Sandhill fulfilled its duty under the contract, I consider the trial court improperly found that Eckerd was entitled to cancel the lease.
Sandhill also contends the trial court erred in allowing Eckerd to terminate the lease because, if Delchamps' failure to lease and pay rent is viewed as a breach, the breach is only non-material. In this regard, the provision that Delchamps would continue to "lease and pay rent" did not confer a benefit on K & B/Eckerd, because the lease did not include a concomitant requirement that Delchamps remain open for business. Rather, Eckerd was benefitted by the continued operation of an anchor store in the shopping center. Certainly, the identity of the grocer that "leased and paid rent" had no effect on Eckerd's operations. Indeed, the trial court received evidence that Eckerd continued operating in the shopping center for six months after Bruno's had acquired the lease from Delchamps.
As support for its non-material breach argument, Sandhill refers to the Restatement (First) of Contracts § 302 (1932), for the proposition that under Florida law, courts should excuse a contract's condition that is not a material part of the bargained-for exchange when enforcement of the condition will cause extreme forfeiture to one party, and is inconsequential to the other party. Eckerd asserts Sandhill's reliance on section 302 of the Restatement (First) of Contracts is misplaced, because section 302 has been replaced by Restatement (Second) of Contracts § 229 (1981).
The principles set forth in the Restatement of Contracts' provisions cited by the respective parties establish a preference for an interpretation that will avoid forfeiture when a condition arises that arguably could result in a forfeiture. Restatement (First) of Contracts § 302 provides:
A condition may be excused without other reason if its requirement
(a) will involve extreme forfeiture or penalty, and
(b) its existence or occurrence forms no essential part of the exchange for the promisor's performance.
American Fire & Casualty Co. v. Collura, 163 So.2d 784 (Fla. 2d DCA 1964), is an apt example of section 302. There, the issue before the court was whether the failure of an insured to make demand upon the insurer to defend him in a negligence action, and to furnish the insurer with copies of the pleadings served upon him, was a breach of a cooperation clause in the insurance contract. Because the insurer had timely received the required copies from plaintiff's attorney, in the negligence action, the court decided the breach was non-material. It further concluded that an insurer may not avoid liability under a policy "by merely showing a violation of *58 one of the condition precedent clauses  without a further showing of how such violation prejudiced the insurer." Id. at 790.
In Varel v. Banc One Capital Partners, Inc., 55 F.3d 1016 (5th Cir.1995), the court discussed the circumstances giving rise to the excuse of a contractual breach by reason of forfeiture in the following terms:
Texas courts disfavor forfeitures. See, e.g., Huff v. Speer, 554 S.W.2d 259, 261 (Tex.Civ.App.-Houston [1st Dist.] 1977, writ ref'd n.r.e.). Texas courts excuse non-performance of a condition precedent if the condition's requirement "`(a) will involve extreme forfeiture or penalty, and (b) its existence or occurrence forms no essential part of the exchange for the promisor's performance.'" Lesikar Constr. Co. v. Acoustex, Inc., 509 S.W.2d 877, 881 (Tex.Civ.App.-Fort Worth 1974, writ ref'd n.r.e.) (quoting Restatement (First) of Contracts § 302); see also Restatement (Second) of Contracts § 229 (replacing First Restatement's § 302) cmt. b (1981) ("In determining whether the forfeiture is `disproportionate,' a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture."). Texas courts construing this test have focused on its second part, examining whether performing the condition precedent was the object of the contract or merely incidental to it, and whether not performing it caused any loss.
Id. at 1018.
Eckerd relies upon Comment b to Restatement (Second) of Contracts § 229, which replaced § 302, and provides:
To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.
Comment b to § 229 states in pertinent part:

b. Disproportionate forfeiture. The rule stated in the present Section is, of necessity, a flexible one, and its application is within the sound discretion of the court. Here, as in § 227(1), "forfeiture" is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange. See Comment b to § 227. The extent of the forfeiture in any particular case will depend on the extent of that denial of compensation. In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture.
Sections 227 and 229 and the comments thereto reaffirm that it is preferable to construe a contract provision so as to reduce the risk of forfeiture. In this regard, Eckerd asserts Sandhill has not suffered a forfeiture, because it allegedly has not relied on any representation in this case, and it still owns the former Eckerd store which it can re-let. Eckerd's assertion that Sandhill has not suffered a forfeiture under the legal definition set forth under comment b of Restatement (Second) of Contracts § 229 does not withstand scrutiny. See Varel.
*59 The facts in the present case convincingly display that no material breach of the contract occurred. The substitution of Bruno's for Delchamps more than fulfilled Sandhill's obligation to provide an anchor store that would attract customers for its remaining tenants. The lease agreement did not require Delchamps to remain in continuous operation. Rather, it provided that Delchamps should continue to lease and pay rent. Clearly, the provision that Delchamps continue to lease and pay rent was not a material part of K & B's and Sandhill's agreement. Rather, the proffered evidence showed that the contractual requirement to lease and pay rent provided a guarantee that if Delchamps closed, it would be motivated to find a new tenant for the grocery store space, which, in fact, occurred. Delchamps assigned its lease to Bruno's, a grocer equal in significance to Delchamps.
Because Eckerd remained in the shopping center for six months after Bruno's moved into the Delchamps space, it is clear the provision requiring Delchamps to continue to lease and pay rent was not a material condition of the parties' agreement, and the assignment of the Delchamps lease to Bruno's was not a material failure of the parties' lease. Because, as reflected by the proffered evidence, the purpose of the original agreement was that an anchor grocery store operate in the shopping center, Eckerd was not relieved of its duty to pay rent or to sublet its premises to another suitable tenant.
The enforcement of the clause, thereby permitting Eckerd to cancel, moreover, results in a disproportionate forfeiture of rental payments owed to Sandhill. Eckerd's cancellation of its lease prior to the end of the lease term results in a loss of rent, pro rata share of taxes, and CAM charges to appellant/lessor. That loss is highly disproportionate to the expense Eckerd would incur in a search for a suitable drug store tenant to fill the space it vacated. In my judgment, appellant's loss of compensation is disproportionate to the inconvenience and relatively nominal expense Eckerd would incur if it were held to its lease and required to find a sub-lessee. Eckerd moreover has made no showing it was prejudiced by Bruno's occupancy of the space leased to Delchamps. In such circumstances, courts have excused conditions similar to the one at issue before us.
I therefore conclude the Eckerd lease contains a latent ambiguity, because the lease is silent as to the rights and duties of the parties in the event Delchamps exercised its contractual right to assign its lease. As a consequence, the trial court erred in failing to recognize the existence of a latent ambiguity in the Eckerd contract, and in failing to receive extrinsic evidence pertaining to the effect of the Delchamps assignment on the Eckerd lease. I would therefore reverse the final judgment and remand the case for proceedings consistent with this dissent.
NOTES
[1] A merger or integration clause is "[a] contractual provision stating that the contract represents the parties' complete and final agreement and supersedes all informal understandings and oral agreements relating to the subject matter of the contract." Black's Law Dictionary, 813 (7th ed. 1999).
[2] Restatement (Second) of Contracts § 229 provides: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange."
[3] The Delchamps lease states in pertinent part:

7. Assignment, Subletting and Concessions.
Tenant shall have the right, at any time after the commencement of the term hereof, to assign this lease, to sublease the Demised Premises (or any part thereof), and to grant concessions therein, for use as a supermarket use as contemplated in the preamble hereof (including without limitation the operation of banking facilities, automated teller machines and the like), or for any other use which does not violate any exclusive use agreements then in existence between Landlord and any other tenant in the Shopping Center....
[4] In this regard, the proffered evidence established that Eckerd's gross sales increased when Bruno's began operating in the shopping center.