BENTON, J.
 

 Palm Lake Partners, II, LLC (Palm Lake) and Falcon Lake Apartments, LLC (Falcon Lake) appeal the judgment entered against them in an action C and C Powerline, Inc. (C & C) brought claiming (as a purported third-party beneficiary) breach of Palm Lake’s contract to purchase real property (Purchase Agreement) from Peter Del Col, John Marchi, and Roy Simpson (Sellers). Sellers (who originally intervened as plaintiffs below, but were subsequently named as defendants in C & C’s amended complaint, and then cross-claimed), cross appeal (against Palm Lake and Falcon Lake) the denial of the full extent of the award of specific performance they sought — the road the trial court ordered built would not adequately accommodate all utilities, they claim — and (against the City) denial of their claim for declaratory relief.
 

 On the main appeal, we reverse the judgment requiring Palm Lake and Falcon Lake to build a road — which also disposes of the specific performance prong of Sellers’ cross-appeal — but remand with directions that the trial court award Sellers liquidated damages as specified in the easement and road construction agreement between Sellers and Palm Lake. On the cross-appeal otherwise, we affirm: The City argues persuasively that Sellers are not entitled to bypass administrative remedies in order to pursue judicial remedies, even declaratory judgment. For whatever reason, C & C never stated a claim against Sellers below and seeks no relief against Sellers here.
 

 I.
 

 Sellers owned a 55-acre parcel in Jacksonville that Palm Lake Drive bisects, as well as a strip of property abutting the 55-acre parcel to the north. C & C operates a business on 30 acres still farther north, and relies on Palm Lake Drive for access to its own property. When C & C’s owner, Chuck Chitty, learned a comprehensive plan amendment — to change the land use designation of Sellers’ parcel from industrial to residential — was under consideration, he spoke to Sellers’ representative, Barry Hurtz. Mr. Chitty was concerned that new residents might complain about truck traffic. Eventually, Messrs. Chitty and Hurtz verbally agreed that C & C would not, in exchange for construction of an alternate access road to C & C’s property, object to any comprehensive plan amendment reclassifying Sellers’ property as residential.
 

 On May 1, 2005, Sellers and Palm Lake signed the Purchase Agreement, which (wholly unbeknownst to C & C at the time) provided: “The parties acknowledge that it will be necessary to build an access road from a city street north of the property
 
 *847
 
 across adjacent property that the Seller owns to Main Street (‘Access Road’). The purpose of the Access Road is to provide alternative ingress and egress to adjacent property owners to the north of the Property. The Access Road will be constructed by Buyer pursuant to the terms and conditions as set forth in Paragraph 11 herein.” Paragraph 11 of the agreement provided, in part:
 

 Access Road: The parties acknowledge that it is necessary to construct an Access Road at the northern boundary of the site to provide alternate access for property owners located north of the Property. Buyer agrees to construct the Access Road pursuant to plans and specifications approved by the parties .... Seller shall pay for one half the cost of the Access Road but no more than Three Hundred Fifty Thousand Dollars ($350,000.00). Seller’s portion of the cost of the Access Road shall be deducted from Purchase Price. Buyer shall pay for the balance of the cost of the Access Road. In the event the Final Bids exeeed[] $900,000, Buyer has the right to terminate this Agreement and receive a return of its deposit. Buyer agrees to bond off and commence construction of the Access Road prior to occupancy of any units on the Property.
 

 Anticipating construction of apartments on the parcel, an application was filed with the City of Jacksonville (City) for a Planned Unit Development (PUD), and, on August 23, 2005, the City enacted Ordinance 2005-740-E, which rezoned the parcel as a PUD, “subject to the written description dated August 11, 2005.”
 
 [1]
 
 The rezoning was also explicitly subject to the following condition: “The development shall proceed in accordance with the Traffic Engineering Memorandum dated August 4, 2005 and attached hereto as Exhibit 4, or as otherwise approved by the Traffic Engineering Division and the Planning and Development Department.”
 
 [2]
 
 As it had promised, C & C did not object to the rezoning that Ordinance 2005-740-E effected.
 

 On February 28, 2006, before access road plans and specifications — much less construction permits or any contract — had been approved, Sellers conveyed the parcel to Palm Lake on the terms set out in the Purchase Agreement as amended by a written grant of easement for a future access road (the easement and road construction agreement), which provided: “Grantee agrees as partial consideration for the grant of this easement by Grantor to bond off and commence construction of the Future Access Road no later than February 28, 2009 and prior to occupancy of any units on the Grantee’s Parcel. If Grantee fails to commence construction by February 28, 2009, Grantee shall pay to Grantor Three Hundred Fifty Thousand and no/100 Dollars ($350,000.00) and shall be released from the obligation to construct the Future Access Road.”
 
 [3]
 

 
 *848
 
 II.
 

 Only after closing did the developers (Palm Lake and Falcon Lake) obtain engineering plans for the access road and FDOT approve a connection to Main Street. Soon thereafter, however, it became apparent that a portion of the access road was proposed to run along a section of Noah Road
 
 [4]
 
 on ground that guy wires steadying Jacksonville Electric Authority (JEA) power lines already occupied. JEA advised all concerned that relocating the guy wires would cost some $800,000, and would take a long time to engineer, and that guy wires might soon be unnecessary altogether because of changes JEA contemplated making in the power grid system.
 

 In February of 2007, the developers discussed with a city councilman the PUD condition requiring construction of an access road as an alternative to Palm Lake Drive. After a later meeting between the developers and certain City officials, the City officials construed the PUD condition as not only not requiring the developers to construct the access road but as not permitting them to do so, either, and a memorandum was placed in the Palm Lake PUD file to the effect that construction of the access road would violate Ordinance 2005-740-E. Palm Lake and Falcon Lake subsequently informed the Sellers and C & C — which learned only in February of 2007 that Sellers had sold the parcel — that the access road would not be constructed.
 

 III.
 

 Apprised of the situation, C & C filed the complaint that began the proceedings below, asserting doubt as to its rights under the ordinance and requesting declaratory judgment. C & C also alleged that it was a third-party beneficiary of the Purchase Agreement between Sellers and Palm Lake, and that Palm Lake had breached the agreement. C & C sought temporary and permanent injunctive relief, including a ban on leasing residential units until an access road was constructed.
 
 [5]
 

 Sellers, who had initially intervened as parties plaintiff, filed cross-claims against Palm Lake, Falcon Lake and the City, after C & C named them as defendants in an amended complaint. Sellers also sought a declaration of their rights under the ordinance as to the City; and under the Purchase Agreement (as modified by the easement and road construction agreement) regarding Palm Lake’s and Falcon Lake’s asserted duty either to build the access road or to return $350,000 to Sellers and to relinquish the easement Sellers had conveyed for construction of an access road.
 

 Eventually, the trial court granted partial summary judgment, ruling that C & C was a third-party beneficiary of the Purchase Agreement’s access road provisions. In a supplemental order, the trial court set out its rationale: that, by not opposing the rezoning, C & C had materially changed its position in justifiable reliance on Sellers’ promise to construct an access road
 
 *849
 
 and that C & C’s justifiable reliance precluded any purported modification of the Purchase Agreement that would permit the access road to go unbuilt. On this basis,
 
 [6]
 
 the trial court concluded that the subsequent easement and road construction agreement was ineffective because Sellers and Palm Lake had entered into it without C & C’s consent. In its final judgment, the trial court ruled that damages would not afford C & C an adequate remedy for the failure to build an access road (providing an alternative to Palm Lake Drive), and that the equitable remedy of specific performance was appropriate.
 

 IV.
 

 On factual findings the parties do not dispute, we review the learned trial judge’s interpretation of the contract documents
 
 de novo.
 
 “The trial court’s interpretation of the contract is a matter of law subject to a de novo standard of review.”
 
 Imagine Ins. Co. v. State ex rel. Dep’t of Fin. Servs.,
 
 999 So.2d 693, 696 (Fla. 1st DCA 2008) (quoting
 
 Jenkins v. Eckerd Corp.,
 
 913 So.2d 43, 49 (Fla. 1st DCA 2005)). Moreover, “a contract which is clear, complete, and unambiguous does not require judicial construction,”
 
 id.
 
 (quoting
 
 Jenkins,
 
 913 So.2d at 50) and, “if the facts of the case are not in dispute, the court will also be able to resolve the ambiguity as a matter of law.”
 
 Id.
 
 (quoting
 
 Strama v. Union Fid. Life Ins. Co.,
 
 793 So.2d 1129, 1132 (Fla. 1st DCA 2001)).
 

 V.
 

 The trial court erred in concluding that the Purchase Agreement, which provided that it “may be amended ... by written instrument executed by both parties,” created an immutable obligation on Palm Lake’s part to construct an access road for the benefit of C & C. Sellers promised C & C an alternative access road without specifying who would finance or build the road, and without indicating that anyone other than Sellers themselves would be responsible for construction of the road. A “promisor and a promisee can by agreement create a duty to a beneficiary which cannot be varied without his consent. But in the absence of such an agreement the parties retain control over the contractual relation they have created.” Restatement (Second) of CONTRACTS § 311 cmt. f. (1981).
 

 The power of the promisor and promisee to discharge or modify the duty owed to a third-party beneficiary by subsequent agreement terminates only “when the beneficiary, before he receives notification of' the discharge or modification, materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee.”
 
 Id.
 
 at § 311(3). In the present case, until February of 2007, C & C was not even aware that Sellers and Palm Lake had entered into the Purchase Agreement.
 

 Inasmuch as the rezoning was fully accomplished on August 23, 2005, C & C did not rely on the Purchase Agreement when it refrained from contesting the rezoning
 
 *850
 
 of Sellers’ parcel.
 
 See Joseph Bucheck Constr. Corp. v. W.E. Music,
 
 420 So.2d 410, 414 n. 4 (Fla. 1st DCA 1982) (“Assuming that Bucheck was an intended beneficiary of the joint venture agreement, Saco and Music would have been free to rescind, vary, or abrogate the agreement as they saw fit, without the assent of third party beneficiary, Bucheck, unless Bucheck had accepted, adopted or acted upon it.”); 13 Richard A. Lord,
 
 Williston on Contracts
 
 § 37:57 at 337, 340 (4th ed. 2000) (“A discharge or variation was therefore considered ineffective after the beneficiary’s acceptance, or detrimental action in reliance upon the promise” and the present view is that “an intended beneficiary’s rights do not vest until the third party has either accepted the agreement or detrimentally relied upon it.”). When C & C decided not to oppose either the amendment to the comprehensive plan or the subsequent rezoning, C & C apparently relied on nothing more than verbal assurances from Sellers that they would see to it that another access road was built.
 
 [7]
 

 The Purchase Agreement contemplated several contingencies and provided that, if rezoning approval and FDOT permits for the access road were not received by May 1, 2006, the agreement would automatically terminate and the option payment would be returned to Palm Lake; and that Palm Lake could elect to terminate the Purchase Agreement if Sellers refused or were unable to cure any title or survey defects or if the City imposed conditions on the PUD which would cause Palm Lake additional costs in excess of $150,000. Any reliance on the Purchase Agreement before the sale closed as conferring an inalienable right to an access road would not have been justifiable.
 

 The Purchase Agreement provided that Palm Lake need not construct an access road in the event final bids exceeded $900,000, and provided that in the event the final bids for construction of the access road exceeded $900,000, Palm Lake had the right to terminate the agreement and to receive a return of its deposit. Neither permits for the access road
 
 [8]
 
 nor final bids for construction of the access road have ever been obtained.
 

 Before the sale closed, the Purchase Agreement did not bind any party to construct an access road. Sellers and Palm Lake remained free to repudiate, alter, amend or supersede the Purchase Agreement’s access road provisions in whole or in part, and did so as part of the closing. C & C’s rights were and could be no greater than Sellers’ rights.
 
 See Crabtree v. Aetna Cas. & Sur. Co.,
 
 438 So.2d 102, 105 (Fla. 1st DCA 1983) (“A third party beneficiary’s right of action on the promise cannot, however, rise higher than the rights of the contracting party through whom he claims.”). On this record, there was no justifiable, detrimental reliance by C & C, as a matter of fact and law. For this reason, we reverse the judgment in favor of C & C against Palm Lake and Falcon Lake.
 

 VI.
 

 The trial court also entered judgment in favor of Sellers against Palm Lake and Falcon Lake. Unlike C & C, which was a stranger to the Purchase Agree
 
 *851
 
 ment, Sellers negotiated directly with Palm Lake and were entitled to the benefit of the agreement they reached with Palm Lake. But, as expressly contemplated by the Purchase Agreement, Sellers and Palm Lake altered the terms of their initial agreement originally set out in the Purchase Agreement, when they executed the easement and road construction agreement at closing.
 

 Relying on paragraph 11 of the Purchase Agreement, the trial court found Sellers were entitled to construction of an access road with infrastructure for electrical, but not for other, utilities. In awarding Sellers the remedy of specific performance, rather than awarding damages, the trial court stated merely that it would be appropriate to grant to Sellers the same remedy it had granted to C & C. But the trial court erred,
 
 inter
 
 alia,
 
 [9]
 
 in failing to recognize that the easement and road construction agreement modified and superseded paragraph 11 of the Purchase Agreement.
 

 The Purchase Agreement called for Palm Lake to build an access road as a condition of purchasing the 55-acre parcel, and contemplated Palm Lake’s expending up to $550,000 ($900,000 minus $350,000) on the project. By the time of closing, however, Palm Lake and the Sellers had made another arrangement, one evidently sufficiently more favorable to Palm Lake to induce Palm Lake to close, and had reduced their revised agreement to writing. Among the terms of their new arrangement,
 
 [10]
 
 was this crucial provision in
 
 *852
 
 the easement and road construction agreement: “If Grantee fads to commence construction by February 28, 2009, Grantee shall pay to Grantor Three Hundred Fifty Thousand and no/100 Dollars ($350,000.00) and shall be released from the obligation to construct the Future Access Road.”
 

 VII.
 

 Because construction did not commence by February 28, 2009, the easement and road construction agreement required that Palm Lake pay Sellers $350,000 in order to be released from the obligation to build an alternative access road. At oral argument, Palm Lake asserted it had tendered the money and remained ready, willing and able to pay the whole amount. However that may be,
 
 [11]
 
 the parties’ revised agreement contains what is essentially a liquidated damages clause
 
 [12]
 
 rather than an open-ended obligation to build a road of the kind the trial court ordered be constructed as specific performance. The trial court’s decision, to grant Sellers specific performance on their cross-claim, rather than damages (on the sole stated ground that “the Court has already determined that [C & C] is entitled to” specific performance), was error.
 

 VIII.
 

 The trial court denied Sellers’ cross-claim seeking a declaration of the rights and duties of the parties under Ordinance 2005-740-E, on grounds these questions should first be addressed to the City. Pursuant to section 656.109 of the City’s Ordinance Code, the Planning and Development Department has the responsibility to “enforce and interpret the Zoning Code, including ordinances related to Planned Unit Development districts.” Any person who is, or stands to be, an adversely affected person as a result of the implementation of any provision of the Zoning Code may request a written interpretation of any zoning ordinance. § 656.109, Jacksonville Ordinance Code (2007). If dissatisfied with the Director’s interpretation, the adversely affected person may appeal the decision to the City Planning Commission pursuant to sections 656.109(b) and 656.135 of the Ordinance Code.
 

 
 *853
 
 Before seeking declaratory relief in court, these administrative remedies should have been pursued. “It is now well settled that where adequate administrative remedies are available, it is improper to seek relief in the circuit court before those remedies are exhausted.”
 
 Cmtys. Fin. Corp. v. Fla. Dep’t. of Envtl. Reg.,
 
 416 So.2d 813, 816 (Fla. 1st DCA 1982). “The doctrine of exhaustion of remedies counsels against judicial intervention in the decision-making function of the executive branch in certain circumstances.... When an agency has discretion to exercise, it should of course be allowed to make discretionary decisions. If a party succeeds in vindicating its rights in the administrative process, thus obviating the need for judicial intervention, judicial resources are conserved; and immediate judicial access can weaken the effectiveness of an agency by encouraging people to ignore its procedures.”
 
 Santana v. Henry,
 
 12 So.3d 843, 846 (Fla. 1st DCA 2009).
 

 The doctrine of exhaustion of remedies applies to municipal governmental agencies no less than it applies to state administrative agencies subject to the Administrative Procedure Act.
 
 See Browne v. City of Miami,
 
 948 So.2d 792, 793-94 (Fla. 3d DCA 2006);
 
 City of DeLand v. Lowe,
 
 544 So.2d 1165, 1168 (Fla. 5th DCA 1989). Indeed, the requirement to exhaust administrative remedies when a municipal agency has jurisdiction over a question antedates enactment of the modern Administrative Procedure Act.
 
 See De Carlo v. Town of W. Miami,
 
 49 So.2d 596, 596 (Fla.1950).
 

 By its terms, Ordinance 2005-740-E is to be interpreted as subject to both the written description dated August 11, 2005, and the apparently conflicting Traffic Engineering Memorandum dated August 4, 2005. Ordinance 2005-740-E provides further that development will proceed “as otherwise approved by the Traffic Engineering Division and the Planning and Development Department.” The trial court wisely refrained from diving into these murky municipal waters when it denied the request for a declaratory judgment for failure to exhaust administrative remedies, which are readily available to Sellers and may very well give Sellers authoritative answers to the road construction questions (or any others) they may have.
 

 IX.
 

 Accordingly, we reverse the judgment entered against Palm Lake and Falcon Lake and in favor of C & C outright. We also reverse the judgment entered against Palm Lake and Falcon Lake and in favor of Sellers, but remand with directions to enter judgment against Palm Lake and Falcon Lake and in favor of Sellers in the amount of three hundred fifty thousand dollars ($350,000.00), together with legal interest from March 1, 2009.
 
 [13]
 
 On the cross-appeal, we affirm.
 

 VAN NORTWICK and CLARK, JJ., concur.
 

 [1]
 

 . The written description provides: "A new road will be constructed to provide direct access to the industrial parcels to the north of the subject property. This new road, linking Main Street to Noah Road, will serve to provide a bypass and eliminate cut-through traffic within the residential development.... The new access road to the northern parcels should be designed and under construction prior to the occupancy of the first dwelling unit."
 

 [2]
 

 . In this memorandum, the Traffic Engineering Division had the following comment after review of the PUD application: "Noah Road shall be terminated in a cul-de-sac prior to Main Street.” The comment reflected the Division’s conclusion that an access road would conflict with the limited access right-of-way for an on-ramp to State Road 9A. The supposed conflict later proved to be a misunderstanding about the location of the proposed road.
 

 [3]
 

 . Palm Lake then entered into a partial as
 
 *848
 
 signment and assumption of agreement with Falcon Lake in which Palm Lake assigned and Falcon Lake assumed Palm Lake’s contractual obligation to construct the access road.
 

 [4]
 

 . Sellers and C & C contemplated that the access road would lie perpendicular to Palm Lake Drive within the platted but unopened Noah Road right of way, then traverse commercial property the Sellers retained, ending at North Main Street.
 

 [5]
 

 . The trial court never granted this relief. The initial certificates of occupancy for the apartment units were issued in February of 2008. The record is devoid of any indication apartment residents have complained about truck traffic.
 

 [6]
 

 . The trial court also reasoned that the $350,000 which was to be paid to Sellers under the terms of the easement and road construction agreement if Palm Lake did not "commence construction by February 28, 2009," was "simply the return of the balance of the purchase price which had been previously credited”; that, in essence, Palm Lake "simply retained the right to perform or not to perform as they chose,” rendering the easement and road construction agreement an illusory contract binding neither side. No party argued this theory below and we reject it. As a factual matter, there was no return of any purchase price or portion thereof. As a legal matter, the easement and road construction agreement simply incorporated a liquidated damages provision.
 

 [7]
 

 . Whether C & C relied on Sellers' assurances and, if so, whether C & C did so justifiably is not before us on this appeal. While C & C named Sellers as parties defendant in its amended complaint, Sellers were nominal defendants only. C & C never actually stated a claim against Sellers for failure to build the road.
 

 [8]
 

 . The Purchase Agreement provided that the closing must take place no later than 30 days after the date that rezoning approvals (in conformity with the contemplated comprehensive plan amendment) and Access Road permits were obtained.
 

 [9]
 

 . Specific performance may be granted only when (1) the plaintiff is clearly entitled to it, (2) there is no adequate remedy at law, and (3) the judge believes that justice requires it.
 
 See Castigliano v. O’Connor,
 
 911 So.2d 145, 148 (Fla. 3d DCA 2005).
 
 See also Linkous v. Linkous,
 
 941 So.2d 530, 530 (Fla. 1st DCA 2006). The "granting of specific performance 'rests largely in the discretion of the [judge] but the right to exercise this judicial discretion does not extend to the power or authority to contravene the legal requirements which must exist to give a litigant grounds upon which he may invoke the remedy.’
 
 Howard Cole & Co. v. Williams,
 
 157 Fla. 851, 858, 27 So.2d 352, 356 (Fla.1946).”
 
 Castigliano,
 
 911 So.2d at 148. The final judgment contains none of the findings required for an award of specific performance.
 

 [10]
 

 . "A promise, no matter how slight, qualifies as consideration if the promisor agrees to do something that he or she is not already obligated to do.”
 
 Cintas Corp. No. 2 v. Schwalier,
 
 901 So.2d 307, 309 (Fla. 1st DCA 2005). Here, under the terms of the easement and road construction agreement, Sellers agreed to convey an easement on which the access road could be constructed and Palm Lake agreed to commence construction of the access road "no later than February 28, 2009 and prior to occupancy of any units” or pay Sellers $350,000. Palm Lake’s duties under the easement and road construction agreement were binding obligations dischargeable in one of two ways.
 

 On the other hand, "while parties unquestionably enjoy the freedom to limit their respective remedies under a contract, a contract must nevertheless be reasonable and must provide to a mutuality of obligation in order to be considered enforceable.”
 
 Hardwick Props., Inc. v. Newbern,
 
 711 So.2d 35, 38 (Fla. 1st DCA 1998);
 
 Pick Kwik Food Stores, Inc. v. Tenser,
 
 407 So.2d 216, 218 (Fla. 2d DCA 1981) ("If one party has the unrestricted right to terminate the contract at any time, that party makes no promise at all and there is not sufficient consideration for the promise of the other.”). The requisite mutuality of obligation entails consideration on both sides.
 
 See Redington Grand, LLP v. Level 10 Props., LLC,
 
 22 So.3d 604, 608 (Fla. 2d DCA 2009),
 
 rev. den.,
 
 32 So.3d 59 (Fla.2010).
 

 "The fact that a contract may, under certain definite circumstances, be terminable at the option of one of the parties does not, as a matter of law, render the contract unenforceable for want of mutuality.”
 
 Bossert v. Palm Beach County Comprehensive Cmty. Mental Health Ctr., Inc.,
 
 404 So.2d 1138, 1139 (Fla. 4th DCA 1981).
 
 See
 
 3 Richard A. Lord,
 
 Williston on Contracts
 
 § 7:13 at 272-79 (4th ed. 1992) ("[W]here the reservation of the right to cancel is for cause, or upon written notice, or
 
 *852
 
 after a definite period following the giving of notice, or upon the occurrence of some extrinsic event, or is based upon some other objective standard, there is consideration for the promisor's promise, despite the fact that he may in fact be able to avoid his obligation.” (footnotes omitted)).
 

 [11]
 

 . A "tender of sums due on a date certain under a contract will stop the accrual of prejudgment interest only when the tender is absolute and unconditional.”
 
 Ismark v.
 
 W.G.
 
 Mills, Inc.,
 
 899 So.2d 1213, 1214 (Fla. 2d DCA 2005).
 
 See also Metro. Dade County v. Rolle,
 
 678 So.2d 904, 906 (Fla. 1st DCA 1996);
 
 Devolder v. Sandage,
 
 575 So.2d 312, 313 (Fla. 2d DCA 1991). We leave for the trial court on remand the questions whether and, if so, when a valid tender occurred in the present case.
 

 [12]
 

 . "There is no question that parties to a contract may agree to limit their respective remedies and that those remedies need not be the same.”
 
 Ocean Dunes of Hutchinson Island Dev. Corp. v. Colangelo,
 
 463 So.2d 437, 439 (Fla. 4th DCA 1985).
 
 See also Lefemine v. Baron,
 
 573 So.2d 326, 328 (Fla.1991) ("It is well settled that in Florida the parties to a contract may stipulate in advance
 
 to
 
 an amount to be paid or retained as liquidated damages in the event of a breach.... [Tjhis Court established the test as to when a liquidated damages provision will be upheld and not stricken as a penalty clause. First, the damages consequent upon a breach must not be readily ascertainable. Second, the sum stipulated to be forfeited must not be so grossly disproportionate to any damages that might reasonably be expected to follow from a breach as to show that the parties could have intended only to induce full performance, rather than to liquidate their damages.”).
 

 [13]
 

 .
 
 See ante
 
 p. 851-52 n. 10;
 
 Argonaut Ins. Co. v. May Plumbing Co.,
 
 474 So.2d 212, 214-15 (Fla.1985).