T.C. Memo. 2020-117

UNITED STATES TAX COURT

STEVEN R. MATZKIN AND SARAH SCHROEDER, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27344-16.                    Filed August 5, 2020.

David D. Aughtry and Kristen S. Lowther, for petitioners.

Christopher D. Bradley, John W. Sheffield III, Rubinder K. Bal, and John T.
Arthur, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge: For petitioners' 2012 tax year the Internal Revenue Service (IRS or respondent) determined a deficiency arising from the alleged under-reporting of gain from the sale of an interest in a limited liability company (LLC) indirectly owned by Steven, petitioner husband. The parties have resolved all

**[*2]** issues except one: whether payments that Steven made to his ex-wife and his divorce lawyer had the effect of increasing the basis in the LLC. We answer this question in favor of respondent.

FINDINGS OF FACT

The parties filed multiple stipulations of facts with accompanying exhibits that are incorporated by this reference. Petitioners resided in Florida when they filed their petition.

A dentist by profession, Steven in January 2003 formed Dental Care Alliance, LLC (DCA), a partnership for Federal income tax purposes. DCA is a dental support organization that provides services to affiliated dentists around the country. On January 1, 2008, Steven assigned his 70% membership interest in DCA (the entirety of his interest) to SRM Consulting, LLC (SRM), an S corporation of which he was the sole shareholder. SRM thereafter owned a 70% membership interest in DCA.[1]

When Steven formed DCA he was married to Georgeann Matzkin. In May 2008, after more than 20 years of marriage, Steven filed for divorce. Steven's

---

[1]Unless otherwise indicated, all statutory references are to the Internal Revenue Code (Code) in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar and all percentage interests to the nearest whole number.

[*3] 100% interest in SRM (and by extension his 70% indirect interest in DCA) constituted marital assets under Florida law. An appraisal performed in 2007 valued DCA at $30 million; Steven's 70% indirect interest was thus assumed to be worth about $21 million.

Steven and Georgeann retained a mediator to assist their negotiations. In a September 22, 2008, letter to attorneys for both spouses, the mediator addressed a proposed division of assets. Attached to the letter was a schedule listing the couple's principal assets, including $4.6 million in cash and securities, $6 million in real estate, $1 million in life insurance, artwork and furniture with a value to be determined, and Steven's indirect interest in DCA, with an assumed value of $21 million.

The schedule proposed to treat all of these assets as marital assets, with their value to be divided 50%-50% between Georgeann and Steven. But Georgeann did not want, and could not realistically be given, a $10.5 million partnership interest in DCA.[2] The letter accordingly anticipated that Steven would pay Georgeann her

---

[2]Georgeann had no professional experience in dentistry, and the DCA partnership agreement required consent from a majority of its managers to admit a new partner. Steven controlled DCA and did not want to be in business with his ex-wife.

[*4] $10.5 million share by making upfront cash payments, by executing a promissory note, and by paying Georgeann's share of the couple's liabilities.

A document executed four days later, captioned "Partial terms of the Matzkin agreement related to Equitable Distributions and Spousal Support," reflected similar terms regarding Steven's indirect interest in DCA. It provided that Steven would make a lump-sum payment to Georgeann and execute a note secured by his interest in the partnership. Interest only would be due on the note, with the principal payable in October 2014 or when DCA was sold (if earlier). The document stated that, if DCA were sold within 18 months for a price exceeding $30 million, then Georgeann would receive half of Steven's pro rata share of any proceeds above $30 million. It specified that Georgeann would receive no alimony apart from Steven's payments on the promissory note, which would "be deemed non-modifiable and non-taxable alimony."

On December 16, 2008, Georgeann and Steven signed a marital settlement agreement (agreement) formalizing the terms of their divorce and the division of their assets. While specifying somewhat different cashflows from the earlier drafts, the agreement followed those drafts by recognizing Georgeann's right to property representing half the value of Steven's indirect interest in DCA. The agreement called for a cash downpayment and monthly payments on a $5.4 million

[*5] promissory note.  Like the previous drafts it provided that, if DCA were sold within 18 months and Steven's share of the proceeds exceeded $21 million (approximately), Georgeann would receive 50% of any excess.  If DCA were sold the promissory note would be accelerated, becoming payable in full 30 days after Steven received proceeds.

The agreement referred to the payments described above as "non-modifiable alimony for * * * [Georgeann's] support and maintenance."  However, it provided that Steven's payment obligations were not terminable on either party's death or on Georgeann's remarriage.  It explicitly stated that Steven's payments were not intended to be taxable to Georgeann or deductible by him for income tax purposes.  The agreement recited that it recorded the parties' "final, complete, and exclusive understanding regarding * * * [their] marital separation, dissolution, and property settlement and supersede[d] any prior or contemporaneous agreement, understanding, or representation, oral or written."

In January 2009 the Florida trial court adopted the agreement and entered a final judgment of divorce.  Steven paid legal fees exceeding $160,000 in connection with the divorce and the negotiations leading up to it.  During 2009, as required by the agreement, Steven paid Georgeann $3 million and discharged her $1,475,500 share of certain joint liabilities.  Between 2009 and 2012 he paid her

[*6] interest in excess of $1.2 million on the promissory note.  As stipulated in the agreement he claimed no tax deductions for any of these payments.  Cf. sec. 215 (as in effect before 2018) (permitting a deduction for alimony or separate maintenance payments).

On May 24, 2012, SRM sold its interest in DCA for $93,770,600.  Gains from that sale passed through to Steven as SRM's sole shareholder.  In June 2012, as required by the agreement, Steven satisfied the $5,462,312 remaining balance of the promissory note.

On their Federal income tax return for 2012 petitioners reported net long-term capital gain of $85,735,315 on the sale of SRM's interest in DCA.  The IRS selected their return for examination and adjusted the gain upward by $5,362,814.  In September 2016 the IRS issued petitioners a timely notice of deficiency reflecting this adjustment and determining a deficiency of $804,423.

Petitioners timely petitioned for redetermination.  On July 9, 2018, the parties filed a stipulation of settled issues in which respondent agreed that the upward adjustment to net capital gain should be no more than $3,270,017.  But petitioners have raised an affirmative issue:  whether SRM is entitled to additional basis in DCA, and thus a downward adjustment to net capital gain, by virtue of Steven's

**[\*7]** payments to Georgeann and his attorney in connection with the divorce. <u>See</u> sec. 6512(b) (granting this Court jurisdiction to determine overpayments).[3]

OPINION

## I.     <u>Evidentiary Issues</u>

Fact witness testimony was provided at trial by Steven and Dominic Baccarella, the attorney who represented him in the divorce. Their testimony chiefly concerned the nature of Steven's payments, which the agreement described as "non-modifiable alimony for * * * [Georgeann's] support and maintenance." Respondent objected to the admissibility of documents and testimony about the parties' negotiations leading up to the agreement, citing the parol evidence rule and the prohibition against hearsay. Having reserved ruling on respondent's objections at trial, we will overrule them and admit this material into evidence.

Respondent objected, on grounds of hearsay, to admission of the mediator's September 22, 2008, letter, which was addressed to Georgeann's attorney and Mr. Baccarella. Rule 801(c) of the Federal Rules of Evidence defines hearsay as an

---

[3]The precise basis adjustment petitioners seek on account of Steven's payments is not entirely clear. An accountant called by petitioners as a summary witness calculated additional basis of $10,050,135, which excluded interest on the promissory note. At times petitioners refer to a basis adjustment of "$9.9 million (plus interest)." At other times they refer to additional basis of $11,307,621, including attorney's fees and interest. Since we hold that they are not entitled to any additional basis, we need not decide its magnitude.

**[*8]** out-of-court statement that "the party offers in evidence to prove the truth of the matter asserted." Petitioners contend, and we agree, that the letter and attached schedule are not hearsay because they were not offered to prove the truth of any matter but rather for the effect they had on Mr. Baccarella as a recipient of the letter. We found his testimony credible as to his understanding of the parties' respective positions, and we find those negotiations relevant because they help resolve ambiguity in the agreement.[4]

In interpreting the agreement we must decide whether evidence outside the document itself is permitted under Florida's parol evidence rule. Generally, parol evidence may not be used to "to contradict, vary, defeat, or modify a complete and unambiguous written instrument, or to change, add to, or subtract from it, or affect its construction." J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So. 2d 484, 486 (Fla. 1957). However, "when the terms of the contract are ambiguous, susceptible to different interpretations, parol evidence is admissible to 'explain, clarify or elucidate' the ambiguous term." Strama v. Union Fid. Life Ins. Co., 793 So. 2d 1129, 1132 (Fla. Dist. Ct. App. 2001) (quoting Friedman v. Va. Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952)). Where (as here) the contract is fully

---

[4]Respondent raised hearsay objections to other documents that memorialized the parties' negotiating history. We will overrule those objections for the reasons discussed in the text.

**[\*9]** integrated, it "can be varied by extrinsic evidence only to the extent that the terms are ambiguous and are given meaning by the extrinsic evidence." <u>Jenkins v. Eckerd Corp.</u>, 913 So. 2d 43, 53 (Fla. Dist. Ct. App. 2005).

Florida generally recognized three types of alimony in 2009: "permanent periodic," "rehabilitative," and "lump-sum." <u>See</u> <u>Rood v. Commissioner</u>, T.C. Memo. 2012-122, 103 T.C.M. (CCH) 1668, 1670 (citing Fla. Stat. sec. 61.08(1) (2006)).[5] Permanent periodic alimony provides for the support and maintenance of a spouse during his or her lifetime but terminates upon the death of the payee spouse. <u>Ibid.</u> Rehabilitative alimony is "paid for the purpose of rehabilitating the spouse to whom it is awarded," e.g., "financially supporting an ill spouse until health is restored, or financially supporting a spouse until he or she can be trained for employment." <u>Ibid.</u> (quoting <u>Cann v. Cann</u>, 334 So. 2d 325, 329 (Fla. Dist. Ct. App. 1976)). "Lump-sum alimony is essentially payment of a definite sum and is in the nature of a final property settlement; hence, an award of lump-sum alimony creates a vested right which survives death and is not terminable on the recipient party's remarriage." <u>Ibid.</u> (quoting <u>Filipov v. Filipov</u>, 717 So. 2d 1082, 1084 (Fla. Dist. Ct. App. 1998)).

---

[5]The Florida alimony statute was amended in 2011, but the <u>Rood</u> opinion interpreted the prior version of the statute that was in effect during 2009.

**[*10]** The agreement described Steven's payments as being made for Georgeann's "support and maintenance." See Pipitone v. Pipitone, 23 So. 3d 131, 136 (Fla. Dist. Ct. App. 2009) ("Ordinarily, the trial court specifies whether lump sum alimony is for support or for equitable distribution."). But the agreement also provided (with seeming inconsistency) that the payments would survive Georgeann's death or remarriage. (Neither party contends that Steven's payments should be considered "alimony" for Federal income tax purposes. See secs. 71, 215.) We find that the agreement is ambiguous and conclude that the parties' negotiating history is relevant in dispelling the ambiguity.

The negotiating history makes absolutely clear that the parties desired to effect an equitable distribution of marital assets, including real estate, cash and securities, life insurance, personal property, and Steven's indirect interest in DCA. The payments specified in the agreement are consistent with the parties' understanding, as shown in the negotiating history, that $10.5 million of value would be placed on Georgeann's side of the ledger on account of Steven's indirect interest in DCA. Because it was impractical for Georgeann to receive a $10.5 million partnership interest in DCA, the parties agreed that she would be paid that value in the form of cash, a promissory note, and Steven's discharge of her share of certain liabilities.

**[\*11]** Although Steven's payments were made over time, they may be considered components of lump-sum alimony payable in installments. See Rood, 103 T.C.M. (CCH) at 1670; Donoff v. Donoff, 691 So. 2d 1091, 1092 (Fla. Dist. Ct. App. 1997); Paetzold v. Paetzold, 673 So. 2d 888, 889 (Fla. Dist. Ct. App. 1996); Turner v. Turner, 529 So. 2d 1138, 1143 (Fla. Dist. Ct. App. 1988). Considering the text of the agreement and its negotiating history, we conclude that the alimony it specified is "[l]ump-sum alimony * * * in the nature of a final property settle-ment * * * [that] creates a vested right which survives death and is not terminable on the recipient party's remarriage." Rood, 103 T.C.M. (CCH) at 1670 (quoting Filipov, 717 So. 2d at 1084).

## II. Net Capital Gain

Respondent contends that Steven's payments to Georgeann, because charac-terized by the agreement as alimony "for her support and maintenance," cannot generate additional basis that would reduce the gain petitioners realized when DCA was sold. Since we interpret the agreement to specify lump-sum alimony in the nature of a final property settlement, we think the proper analysis is slightly more complicated. But we nevertheless agree with respondent's bottom line.

SRM, an S corporation of which Steven was the sole shareholder, owned a 70% membership interest in DCA when it was sold in May 2012. DCA was a

[*12] partnership for Federal income tax purposes. SRM's gain on the sale of its partnership interest is calculated as the difference between the amount SRM realized on the sale and SRM's basis in DCA. See sec. 741 (providing that gain from the sale of a partnership interest is generally treated as gain from sale or exchange of a capital asset). The parties agree that petitioners bear the burden of proof with respect to establishing SRM's basis in DCA. And we have jurisdiction in this proceeding to determine the correctness of all relevant adjustments. See Tabe v. Commissioner, T.C. Memo. 2019-149, at *11.

A partner's basis in a partnership is generally determined under section 705, captioned "Determination of Basis of Partner's Interest." Upon formation on January 1, 2008, SRM's basis in DCA presumably equaled Steven's basis in DCA. See sec. 705(a) (cross-referencing sections 722 and 742). Section 705(a)(1) provides that a partner's initial basis is increased by the sum of the partner's distributive share of "(A) taxable income of the partnership as determined under section 703(a), (B) income of the partnership exempt from tax under this title, and (C) the excess of the deductions for depletion over the basis of the property subject to depletion." Steven's payments to Georgeann and his divorce lawyer did not affect SRM's distributive share of DCA's income or deductions. Accordingly, these

**[*13]** payments did not increase or otherwise affect SRM's basis under section 705(a)(1).

The basis of a partner's interest is also increased by any subsequent "contribution of property, including money, to the partnership," and by a partner's assumption of partnership liabilities. See secs. 722, 752(a). But Steven's payments to Georgeann and his divorce lawyer did not result in DCA's receipt of any money or other property. Nor did SRM (or Steven) assume any of DCA's liabilities.

Petitioners characterize Steven's payments as "acquisition costs" and contend that they generate basis under section 742, which provides that "[t]he basis of an interest in a partnership acquired other than by contribution" shall be determined under the Code's general basis rules. See sec. 742 (cross-referencing sections 1011-1022). But SRM owned 70% of DCA both before and after the divorce. Neither Steven nor SRM "acquired" any interest in DCA (from Georgeann or anyone else) in consequence of these payments.

In short, while we agree with petitioners that Steven's payments to Georgeann were part of a property settlement, it does not follow that his payments generated additional basis in DCA. The conclusion would be the same (if perhaps more obvious) if the key marital asset consisted of publicly traded stock rather than a partnership interest. For example, assume that Steven owned $21 million of

**[*14]** IBM stock, which the parties regarded as a marital asset whose value was to

be split 50%-50% between them. If Georgeann received $10.5 million of IBM

stock in the property settlement, Steven could not plausibly contend that his basis

in his retained IBM shares should be increased by $10.5 million. And the result

would be no different if Steven retained all the IBM shares and paid Georgeann

the value of her 50% interest in cash.[6]

As it was, the key marital asset was a 70% interest in a partnership that sup-

plied technical support services to dentists. In theory, the property settlement

could have awarded Georgeann a 35% interest in the partnership, but that was

impractical for numerous reasons: Georgeann had no expertise in that business,

admission of a new partner would require consent of a majority of its managers,

and Steven did not want to be in partnership with his ex-wife. So the spouses

sensibly agreed to have Georgeann receive the value of her $10.5 million share in

---

[6]Alternatively, assume a divorcing couple that has marital assets consisting of a house worth $1 million and $1 million of cash. If the husband received the house and the wife received the cash, the husband's basis in the house would be unchanged; he could not increase his basis by the $1 million received by the wife. See sec. 1041(b) (providing a transferred basis rule). The result would be the same if the husband received the house, the couple split the cash, and the husband gave the wife a $500,000 promissory note for her share of the house. It is imma-terial whether the $1 million received by the wife consists of cash or cash plus a promissory note; in neither event can the husband claim additional basis in the house.

**[\*15]** cash rather than in kind.  Steven's payments in fulfillment of that obligation did not generate additional basis in DCA, just as they would not have generated additional basis if the asset in question had been publicly traded stock.

III.    Petitioners' Arguments

Petitioners assert that Georgeann's claim to an equitable share of marital assets constituted a "cloud hanging over" Steven's title to his partnership interest.  He anticipated that DCA would eventually be sold, and as seller he would need to convey good title to the buyer.  The payments he made to Georgeann and his divorce lawyer were supposedly made "in order to retain clear title over the DCA membership interests which he retained."  Petitioners then cite the principle that "[a]mounts paid to defend or perfect title to real or personal property are amounts paid to acquire or produce property * * * and must be capitalized."  Sec. 1.263(a)-2T(e)(1), Temporary Income Tax Regs, 76 Fed. Reg. 81103 (Dec. 27, 2011).[7]

We find this argument unpersuasive for several reasons.  First, the payments to Georgeann and to the divorce lawyer were made by Steven, not by SRM, which owned the 70% partnership interest in DCA.  SRM does not appear to have incurred any expenses to "clear title" to its ownership interest.  Petitioners have not

_____

[7]This temporary regulation was finalized in September 2013.  See sec. 1.263(a)-2(e)(1), Income Tax Regs.

**[*16]** satisfactorily explained why Steven's payments, if capitalizable at all, should not be capitalized to his basis in SRM, rather than to SRM's basis in the partnership.

Second, even if Steven had owned a direct partnership interest in DCA, Georgeann's claim to marital assets did not cloud his title, and his payments to her were not made to "defend or perfect title to * * * personal property." Ibid. When Steven filed for divorce, Georgeann accrued a claim for an equitable share of the marital assets. This claim did not cloud Steven's title to any particular asset that he owned, be it real estate, bank accounts, stocks and bonds, works of art, or partnership interests.

Rather, Georgeann accrued a claim to receive her equitable share of the value of the marital assets. See Fla. Stat. sec. 61.075(8) (2008) (providing that designation as marital property "is only for evidentiary purposes in the dissolution proceeding and does not vest title"). It was up to the parties (or the divorce court absent agreement) to decide which assets would be conveyed to Georgeann to satisfy her claim to that value. Even if Georgeann had desired an ownership interest in DCA--there is no evidence that she did--her recourse against Steven to secure an equitable share of marital assets would not have included the ability to compel a reallocation of partnership interests. See Schiller v. Schiller, 625 So. 2d

**[\*17]** 856, 859 (Fla. Dist. Ct. App. 1993) ("[I]t is well established that a creditor of an individual partner cannot levy directly on a partner's interest in a partnership, nor on the partnership assets.").

If Steven had been recalcitrant in meeting his payment obligations under the agreement, Georgeann would have had various collection remedies at her disposal. Under Florida law these remedies might have included a "charging order." See Fla. Stat. sec. 608.433(4) (2009).[8]  A charging order is a remedy available to a "judgment creditor" of an LLC member or partner in a limited partnership.  Ibid. Upon application to a court, the judgment creditor may receive an order "that instructs the entity to give the creditor any distributions that would otherwise be paid to the partner or member from the entity."  Capstone Bank v. Perry-Clifton Enters., LLC, 230 So. 3d 970, 971 (Fla. Dist. Ct. App. 2017) (quoting Alan S. Gassman, "After Olmstead:  Will a Multiple-Member LLC Continue to Have Charging Order Protection?", 84 Fla. B.J. 10 (Dec. 2010)).

Petitioners contend that the potential availability to Georgeann of a "charging order" remedy generated a cloud on Steven's title, but this argument is unpersuasive.  The scenario petitioners imagine is entirely hypothetical:  Steven and

---

[8]Florida revised its LLC statute effective for 2014, and the "charging order" provision now appears at Fla. Stat. sec. 605.0503 (2020).

[*18] Georgeann agreed to an equitable division of their marital assets, and Steven honored his obligations as set forth in the agreement. It is always possible that a debtor will default on his obligations. But the fact that the creditor would have collection remedies in the event of default does not create, ab initio, a cloud on the debtor's title to his assets.

The regulations require capitalization of "[a]mounts paid to defend or perfect title to * * * personal property." Sec. 1.263(a)-2T(e)(1), Temporary Income Tax Regs., supra. Georgeann never questioned Steven's title to the indirect interest he held in DCA (or to any other personal property). In effect, petitioners argue that any debtor who honors his obligations is entitled to capitalize those payments on the theory that he is removing a cloud on his title to assets that might be subject to collection action if he defaulted. That is plainly not the law; if it were, every payment by a partner on a personal debt would increase his basis in the partnership.[9]

_____

[9]Even if Georgeann had threatened a charging order during the parties' negotiations--there is no credible evidence that she did--that action by itself would not have clouded SRM's title to its partnership interest. Under Florida law a charging order requires application to a court. See Fla. Stat. sec. 608.433(4) (2009). Petitioners cite Boulware v. Mayfield, 317 So. 2d 470 (Fla. Dist. Ct. App. 1975), for the proposition that even a spurious request for a charging order may cloud title. But in Boulware, unlike here, the creditor actually made a claim upon title. See id. at 472.

**[*19]** In support of their theory petitioners cite <u>Eisler v. Commissioner</u>, 59 T.C. 634 (1973). The question there was whether the amount paid to settle a lawsuit (and the legal fees incurred in the lawsuit) were deductible as ordinary business expenses or had to be capitalized. The taxpayer had signed an employment contract that entitled him to receive stock but gave his company the right to reacquire the stock if he terminated his employment. <u>Id.</u> at 635. Litigation arose after the taxpayer quit his job: The company demanded return of the stock and filed counterclaims alleging negligence by the taxpayer in performing his duties. We bifurcated the taxpayer's payments. To the extent the payments were attributable to resolving the negligence counterclaims, the payments were deductible. <u>Id.</u> at 641. To the extent the payments were attributable to resolving the dispute over ownership of the stock, they had to be capitalized as a cost of "defending or perfecting title to property." <u>Id.</u> at 640.

The <u>Eisler</u> case is inapposite. Given the company's contractual right to reacquire the stock, there was a genuine dispute--and actual litigation--regarding ownership of the shares. Thus, a portion of the payments was properly capitalized as a cost of defending the taxpayer's title to property. Here, the parties stipulated that Georgeann owned no property interest in DCA; she had no claim of title to SRM's partnership interest in DCA and at no point asserted any such claim. She

**[\*20]** did not question Steven's title to any particular asset that he owned, but held only an equitable claim against the marital assets generally.[10]

Petitioners likewise err in relying on United States v. Gilmore, 372 U.S. 39 (1963). The taxpayer there sought to deduct legal expenses incurred during his divorce in litigating his wife's claim to community property. The Court looked to the "origin and character of the claim"; finding it personal in nature, the Court upheld disallowance of a deduction. Gilmore, 372 U.S. at 44. The Court did not consider whether the legal fees could be capitalized or otherwise address the basis consequences of its holding. Gilmore, like Eisler, involved an actual dispute over the ownership of property. This case does not.

Finally, petitioners complain that, if we do not allow a basis increase, they will have no way of recovering the costs of Steven's divorce against his taxable income. That is correct and unsurprising. Steven agreed to a property settlement

---

[10]Petitioners contend that Georgeann "asserted a claim" against Steven's interest in DCA because the schedule attached to the mediator's letter placed half of its value ($10.5 million) on her side of the ledger. But that schedule also placed on her side of the ledger $2.3 million in cash and securities, $3 million of real estate, $519,000 of life insurance, and half of the value (to be determined) of artwork and furniture--viz., 50% of the value of each asset. The proposal to split the value of the marital assets 50%-50% did not constitute the assertion of a claim against Steven's interest in DCA any more than it constituted the assertion of a claim against his furniture, artwork, or bank accounts. There is no credible evidence that Georgeann ever asserted a claim against Steven's interest in DCA.

**[*21]** through which Georgeann received an equitable share of the marital assets. Spousal payments made pursuant to a property settlement are not tax-deductible. See Rood, 103 T.C.M. at 1670. Had Steven made payments that qualified as "alimony" for Federal income tax purposes, those payments would have been deductible. See sec. 215. But the agreement explicitly stated the parties' understanding that, for income tax purposes, the payments would be neither taxable to Georgeann nor deductible by him.

In consideration of the foregoing,

Decision will be entered under

Rule 155.