# Third District Court of Appeal

## State of Florida

Opinion filed March 9, 2016.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D14-726
Lower Tribunal No. 10-283-P
_____

## Gene Lentz, Maria Lentz, and Gladys Marcos,
Appellants,

vs.

## Community Bank of Florida, Inc., etc.,
Appellee.

An Appeal from the Circuit Court for Monroe County, Sandra Taylor, Senior Judge.

Hutchison & Tubiana, P.L.L.C., and David G. Hutchison (Key Largo), for appellants.

Lott & Levine, and George J. Lott, for appellee.

Before SUAREZ, C.J., and SHEPHERD and SCALES, JJ.

SCALES, J.

Appellants Gene Lentz, Maria Lentz and Gladys Marcos ("Borrowers") appeal a final summary judgment of foreclosure in favor of Appellee Community Bank of Florida ("Bank"). Because the trial court erred by not enforcing the parties' mediated settlement agreement ("MSA"), we reverse and remand to the trial court for the appropriate enforcement of the MSA.

**I. Facts**

*A. The MSA*

In April 2010, after the Borrowers had stopped making payments on a promissory note secured by a mortgage encumbering residential real property in Key Largo (the "Property"), the Bank brought suit against the Borrowers seeking to foreclose on the Bank's mortgage.

The trial court ordered the case to mediation. The parties mediated the case on October 24, 2011. At the time of the mediation, the Bank's records indicated that the Borrowers owed $337,328.41 in principal on the promissory note. The mediation resulted in the MSA which, in handwritten form, contained twelve enumerated provisions, several of which are pertinent to this appeal.

In the MSA, the Bank agreed to reinstate/modify the loan, if the Borrowers qualified for such reinstatement/modification. Pursuant to the MSA, the principal amount of the new loan would be $382,500 (representing the $337,328.41 in outstanding principal, plus approximately $41,000 in legal expenses and

2

approximately $4,100 in other expenses incurred by the Bank related to the Property) (the "New Loan").

Pursuant to the MSA, monthly payments for the New Loan would be calculated based on a 6% interest rate (as opposed to the "old" loan's 7.5% interest rate), with a 40-year amortization and a balloon payment due after five years. Additionally, the Borrowers' monthly payment would include escrow payments for real property taxes and insurance. The Borrowers would be required to pay all closing costs associated with the New Loan.[1]

Per the MSA, assuming the Borrowers qualified for the New Loan, the closing on the New Loan would occur at the Bank's office in Homestead within forty-five days from the date of the MSA. Upon closing, the Bank would dismiss the foreclosure case with prejudice and report the modification to the credit reporting agency.

The MSA also required the Borrowers, within seventy-two hours of the effective date of the MSA, to pay the Bank the cash amount of $52,000, which the parties stipulated was the amount necessary to bring the "old" loan current. The MSA required that the Borrowers' $52,000 cash payment be held in escrow by Bank, and refunded to the Borrowers within seventy-two hours if and when the

---

[1] While not specified in the MSA, the record indicates: (i) the monthly principal and interest payment would be $2,127.63; (ii) for the New Loan's first year, the monthly property tax and insurance payment would be $1,012.69; and (iii) anticipated closing costs of the New Loan would be approximately $3,000.

Bank did not qualify the Borrowers for the New Loan. As is customary in these situations, the Borrowers were required to provide documents to the Bank to allow the Bank to make its qualification determination.

B. *The MSA Aftermath*

Shortly after the MSA was executed, the Borrowers made the $52,000 cash payment to the Bank, which, initially, held the funds in escrow as required by the MSA. The MSA's 45-day time period passed, however, without the occurrence of a closing for the New Loan. In fact, the record indicates the Bank did not prepare any documents associated with the New Loan (i.e., a revised promissory note or a mortgage modification agreement).

The parties dispute the reasons for the New Loan not closing within the 45-day period required by the MSA. The Bank suggests that the Borrowers did not provide the requisite information (i.e., proof of property insurance and Borrower bank statements) to allow the Bank to qualify the Borrowers for the New Loan. Yet, despite its not receiving complete information to qualify the Borrowers, the Bank did not return the $52,000 to the Borrowers as was required if the Borrowers failed to qualify for the New Loan.

Pointing to correspondence between the Bank and its counsel,[2] the Borrowers suggest that the Bank did not intend to honor the terms of the MSA,

---

[2] On January 20, 2012, an officer of the Bank sought and received from Bank counsel assurance that the Bank could retain the $52,000 if the Borrowers did not

4

and merely used the mediation process to obtain a $52,000 cash payment from the Borrowers.

In any event, approximately ninety days after the MSA – on January 23, 2012 – the Bank issued a commitment letter to the Borrowers purporting to offer the Borrowers a loan modification reflecting the terms of the MSA. The commitment letter stated that the Bank had qualified the Borrowers for the New Loan; the commitment letter also required the signature of the Borrowers prior to January 31, 2012.

Pursuant to this commitment letter, the Bank would presumably prepare the loan modification documents and, at closing on the New Loan, apply the $52,000 paid by the Borrowers to "past due delinquent payments" for the "old" loan. The letter, however, required any additional past due amounts on the "old" loan, "including and not limited to past due interest, Lender's Placed Insurance and Real Estate Taxes," to be paid in cash by the Borrowers at closing on the New Loan. According to a schedule attached to the Bank's commitment letter, this additional amount due at closing totaled $19,983.01.

---

accept the Bank's terms – which would be manifested shortly in a commitment letter – and close on the New Loan. Bank counsel based this opinion on the commitment letter which would demonstrate that the Borrowers qualified for the New Loan. The Bank's commitment letter, however, varied the terms of the MSA and, in the Borrowers' view, allowed the Bank to avoid the closing.

The commitment letter called for a February 23, 2012 closing date on the New Loan. According to the commitment letter, the Borrowers would agree that, in the event the New Loan did not close on or before February 23, 2012, the $52,000 they had paid into escrow would be applied to delinquent amounts due on the "old" loan, and the Borrowers would no longer be eligible for the modification arrangement.

Asserting that the Bank had unilaterally and materially altered the terms of the MSA, the Borrowers refused to execute the Bank's January 23, 2012 commitment letter.[3]

Without seeking leave of the trial court, and without either: (i) seeking to enforce the MSA against the Borrowers, or (ii) asserting that the Borrowers had breached the MSA, the Bank removed the $52,000 from the escrow account and applied the payment to the Borrowers' past due amounts on the "old" loan. The Bank then proceeded with the foreclosure.

The Borrowers, however, filed a motion in the trial court seeking an order requiring the Bank to honor the terms of the MSA.

C. *The Trial Court's Order on the Borrowers' Motion to Enforce MSA*

---

[3] It bears noting that the MSA did not reference a commitment letter, much less an obligation on the part of the Borrowers to execute a commitment letter as a condition precedent to the Bank honoring its obligation to modify the "old" loan with a new set of loan terms.

Over the course of two days, the trial court conducted an evidentiary hearing, eliciting testimony from the Borrowers and from a representative of the Bank. In November 2013, the trial court rendered an order denying the Borrowers any relief.

The trial court determined that the parties inadvertently created an ambiguity in the MSA by not articulating the conditions under which the $52,000 either would be forfeited by, or returned to, the Borrowers. The MSA's only express provision in this regard was that the funds had to be returned to the Borrowers in the event the Bank did not qualify the Borrowers for the New Loan.

The trial court determined that neither side breached the agreement, but reasoned that enforcement of the agreement would be unfair to the Bank because of the passage of time between the October 2011 MSA and the trial court's November 2013 order.[4]

Having prevailed on the Borrowers' motion to enforce, the Bank proceeded with the foreclosure and, in February 2014, obtained a final summary judgment of foreclosure against the Borrowers in the amount of $527,601.55 (which includes $331,183 in outstanding/accelerated principal, approximately $169,000 in interest

---

[4] During this interval, the Borrowers made no payments on either the "old" loan or the New Loan. In fact, the Bank was no longer accepting payments on the "old" loan, and the New Loan was never memorialized.

accruing at the default rate of 18%, and approximately $28,000 in costs and recoupment of premiums for forced-placed insurance and taxes).[5]

The Borrowers appeal the trial court's final summary judgment. The Borrowers argue that the trial court reversibly erred by not requiring the Bank either to: (i) honor the terms of the MSA, or (ii) return the $52,000 escrow payment to the Borrowers.[6]

## II. Analysis

### A. *Standard of Review*

In this case, while we are ultimately called upon to review the trial court's entry of summary judgment for the Bank, the inherent issue is whether the trial court erred by denying the Borrowers' motion to enforce the MSA. If the trial court erred in denying the Borrowers' motion to enforce, then the summary judgment must be reversed.

Our review of the trial court's order denying the Borrowers' motion to enforce the MSA involves the construction and interpretation of the parties' MSA, and essentially, whether the Bank's interposition of the commitment letter

---

[5] The final judgment of foreclosure does not itemize how the Borrowers' $52,000 payment was applied to the amounts due under the "old" loan; however, the Borrowers have not raised this as a point of error and, because of our decision reversing the final judgment, we need not reach this issue.

[6] The Borrowers raise other issues associated with the final summary judgment that, because of our decision reversing the judgment, we need not reach.

constituted a breach of the parties' MSA. Thus, our review is de novo. <u>Volusia Cty. v. Aberdeen at Ormond Beach, L.P.</u>, 760 So. 2d 126 (Fla. 2000).

### B. *The Bank's Commitment Letter Constitutes a Breach of the MSA*

The trial court found that the Bank's interposition of the commitment letter did not constitute a material breach of the parties' MSA. The trial court specifically held that the Bank's commitment letter's terms did not materially alter the terms of the MSA.[7]

We disagree with the trial court on this crucial, and indeed dispositive, issue. As reflected in the unambiguous terms of the MSA, the parties at mediation negotiated and agreed upon the specific amount of money ($52,000) required to bring current the "old" loan. Upon payment of the $52,000, the Bank was obligated, within forty-five days, to enter into the New Loan if the Bank determined the Borrowers were qualified. The material terms of the New Loan were specifically enumerated in the MSA. If, for whatever reason, the Bank determined that the Borrowers were not qualified for the New Loan, then the Bank

---

[7] Apparently, the trial court fairly extensively relied on the testimony of the Bank's witness at the evidentiary hearing. We do not quarrel with the trial court's factual findings resulting from its weighing of testimony adduced at this hearing. The relevant provisions of the MSA are unambiguous, however, and therefore, may not be modified by court interpretation. <u>Fed. Home Loan Mortg. Corp. v. Molko</u>, 602 So. 2d 983 (Fla. 3d DCA 1992) (Mem). Parol evidence should not have been used to vary the unambiguous terms of the MSA. <u>See</u> <u>Jenkins v. Eckerd Corp.</u>, 913 So. 2d 43, 52-53 (Fla. 1st DCA 2005).

9

was required to return the $52,000 payment to the Borrowers within seventy-two hours of such determination, and the Bank could then proceed with foreclosure.

While the MSA required the Borrowers to pay, at closing, those closing costs associated with the New Loan, <u>nothing</u> in the MSA required the Borrowers to pay to the Bank, at closing, any funds associated with the "old" loan.

The plain and unambiguous language of the MSA evidences that the parties negotiated and stipulated to the precise mechanism for the Bank's recovery of amounts associated with the "old" loan. First, the parties agreed to a revised principal balance of $382,500 for the New Loan. This amount included approximately $45,000 over and above the $337,328.41 in "old" loan principal due at the time of the MSA. Second, the parties expressly agreed that the sum of $52,000 was required to bring the "old" loan current.

Hence, as expressly required by the MSA, had the Bank closed on the New Loan within forty-five days of the MSA, the Bank immediately would have recovered the $52,000, which it stipulated it was owed on the "old" loan; and, over the life of the New Loan, the Bank would have recovered an additional $45,000 in expenses, plus interest, related to the "old" loan. This is the arrangement the Bank agreed to in the MSA.

Yet, the Bank's commitment letter required the Borrowers to pay an additional amount of $19,983.01 at the New Loan's closing, in order for the Bank

to do what it had already agreed to do in the MSA. Even a cursory reading of the schedule attached to the Bank's commitment letter reveals that this additional $19,983.01 payment had nothing whatsoever to do with closing costs or anything else associated with the New Loan.

It appears from the schedule attached to the Bank's commitment letter that these sums were known to the Bank at the time the MSA was negotiated, but nothing was specified in the MSA to obligate the Borrowers to pay these sums to the Bank at the New Loan's closing.

Despite the unambiguous, express provisions of the MSA, the Bank successfully urged the trial court to read into the MSA an unexpressed requirement that the Borrowers pay additional funds associated with the "old" loan as a condition precedent to the Bank honoring its obligation to provide the New Loan.

The Bank's insistence on this additional payment of $19,983.01 from the Borrowers as a condition to close on the New Loan – when no such requirement appeared in the MSA – constituted the Bank's material breach of the MSA. The trial court reversibly erred by holding otherwise and denying the Borrowers' motion to enforce the MSA.

### C. *The Trial Court's Dilemma*

We are not unsympathetic to the dilemma that this case's unique factual profile presented to the trial court. The trial court was asked to compel the Bank to

offer a loan modification to the Borrowers who, for several years after a loan modification was to take place, had not made any mortgage payments to the Bank and remained in residence at the Property. Any such prejudice suffered by the Bank, however, was caused by the Bank's own improper interpretation of the MSA. No provision of the MSA authorized the Bank to condition the New Loan on the Borrowers' payment of an additional $19,983.01.

Our decision is guided by the strong policy in Florida to promote settlement and to enforce settlement agreements. Hernandez v. Gil, 958 So. 2d 390, 391 (Fla. 3d DCA 2007). This is especially fitting when settlement results from formal mediation. The parties in the instant case specifically negotiated a set of provisions related to both the "old" loan and the New Loan. Those negotiations were manifested in the express terms of the MSA. The practical effect of the trial court's decision not to enforce the MSA was to render the Bank's MSA obligations illusory. See Pan-Am Tobacco Corp. v. Dep't of Corrections, 471 So. 2d 4, 5 (Fla. 1984) ("a contract which is not mutually enforceable is an illusory contract").

The trial court found that neither party breached the MSA, yet the New Loan – the object of the MSA – was not established despite the Borrowers having qualified for the New Loan. The Bank was allowed to retain the $52,000 escrow payment, proceed with the foreclosure (even being awarded default-rate interest), and not honor the provisions of the MSA.

Meanwhile, the Borrowers complied with the terms of the MSA by making the $52,000 escrow payment. The Borrowers were ready, willing and able to close on the New Loan pursuant to the MSA's terms. Although the trial court determined that no party had breached the MSA, the trial court neither rescinded nor enforced the MSA. As a result, the practical effect of the remedy visited upon the Borrowers by the trial court's denial of the motion to enforce was as if the Borrowers had breached the MSA.

**III. Conclusion**

We reverse the final summary judgment, and remand the case to the trial court to enforce the terms of the parties' MSA.

Reversed and remanded.