# Third District Court of Appeal

## State of Florida

Opinion filed March 30, 2022.
Not final until disposition of timely filed motion for rehearing.

_____

No. 3D21-458
Lower Tribunal No. 12-3545
_____

**Scott Alan Orth,**
Appellant/Cross-Appellee,

vs.

**Marcy Orth,**
Appellee/Cross-Appellant.

An Appeal from the Circuit Court for Miami-Dade County, Marcia del Rey, Judge.

Law Offices of Scott Alan Orth, P.A., and Scott Alan Orth and Eric Salvatore Giunta (Hollywood), for appellant/cross-appellee.

Lorenzen Law, and Dirk Lorenzen, for appellee/cross-appellant.

Before LINDSEY, HENDON, and LOBREE, JJ.

HENDON, J.

This appeal relates to the enforceability and interpretation of a marital settlement agreement ("MSA")[1] entered into between the parties, Scott Alan Orth ("Former Husband" or "Scott") and Marcy Orth ("Former Wife" or "Marcy"). The Former Husband appeals, and the Former Wife cross-appeals, from the January 5, 2021 Order Denying Exceptions and Cross-Exceptions to the General Magistrate's Report dated June 19, 2018, and the General Magistrate's Interim Report dated April 30, 2018, on the Former Wife's Motion to Enforce Final Judgment. We affirm in part, reverse in part, and remand for entry of an order(s) on the parties' exceptions consistent with this opinion.

## I. FACTS AND PROCEDURAL HISTORY

In 2012, the Former Wife petitioned to dissolve her marriage to the Former Husband. On July 31, 2012, the parties entered into the MSA, which was filed in the lower tribunal in August 2012. On August 20, 2012, the trial court entered a Final Judgment of Dissolution of Marriage ("Final Judgment"), which provides as follows:

> On August 20, 2012, this cause came before this Court for a hearing on a Petition for Dissolution of Marriage. The Court, having reviewed the file and heard the testimony, makes these findings of fact and reaches these conclusions of law:

---

[1] The MSA was titled "Separation and Settlement Agreement."

2

1. The Court has jurisdiction over the subject matter and the parties.

2. Both parties have been residents of the State of Florida for more than six (6) months immediately before the filing of the Petition for Dissolution of Marriage.

3. The wife is not pregnant. The parties have no minor children. The children of the marriage are all pursuing College and University degrees and are well cared for.

4. The marriage between the parties is irretrievably broken. Therefore, the marriage between Scott Alan Orth and Marcy Le Vine Orth is dissolved, and the parties are restored to the status of being single.

5. All marital property and marital debts have been divided by a written agreement fully and voluntarily executed by the parties with the assistance of counsel.

6. The parties have entered into a Separation and Settlement Agreement dated July 21, 2012, filed under notice with the Court on August 8, 2012.

7. The Court reserves jurisdiction to enforce this judgment.

DONE AND ORDERED in Chambers, Miami, Dade County, Florida this 20th day of August 2012.

In November 2017, in the dissolution action, the Former Wife filed the Motion to Enforce Final Judgment ("Motion to Enforce"), seeking to enforce provisions in the MSA relating to the Former Husband's obligation to continue providing health insurance to the Former Wife and to maintain a

3

$500,000 life insurance policy naming the Former Wife as the beneficiary.

The relevant provisions in the MSA provide as follows:

6. **MONTHLY SUPPORT AND DISTRIBUTION**

. . . .

e.   The support obligation is not modifiable nor is it terminable . . . .

. . . .

h.  Health Insurance for Marcy.

i.   Scott shall continue to provide health insurance under the current plan or a reasonably equivalent and comparable plan for Marcy through his law practice as long as same continues and is legally obtainable.

ii.   The obligation to provide insurance continues until Marcy qualifies for Medicare (whether or not she applies). In the event that Scott cannot or does not provide this insurance, his support obligation will be increased equal to the pro rata charge for insurance applicable to Marcy as of July, 2012 or the reasonable cost for Marcy to obtain cover, whichever is greater.

. . . .

8. **LIFE INSURANCE**

1. As security for support, Scott shall maintain life insurance contracts/policies in the amount of $500,000 and will designate Marcy as the primary beneficiary of these policies for as long as he has a support obligation. . . .

In December 2017, the trial court referred the Former Wife's Motion to Enforce to a general magistrate. That same month, the Former Husband moved to strike the Motion to Enforce, asserting that there is "nothing in the Final judgment to 'enforce'" and that "the proper vehicle would appear to be a petition to modify alimony." The trial court denied the Former Husband's motion to strike.

The general magistrate conducted two hearings on the Former Wife's Motion to Enforce—the first on April 6, 2018, and the second on May 9, 2018. During these hearings, the testimony and evidence showed that when the parties entered into the MSA in 2012, the Former Wife was insured under a preferred provider organization plan ("PPO") through the Former Husband's law office. The PPO plan had a $2,000 annual deductible, and the Former Wife's existing primary care physician, Dr. Franco, who has treated her for at least twenty-two years, and her preferred hospital, Aventura Hospital, were "in network" providers. The Former Wife further testified that prior to entering into the MSA, the Former Husband promised her that she could continue seeing Dr. Franco and go to Aventura Hospital although this alleged promise was not included in the MSA. Further, the Former Wife testified she began smoking cigarettes in high school, and smoked during the majority of the marriage.

For insurance year 2016, the Former Husband changed plans, and he paid the Former Wife's insurance premium. As to insurance year 2017, the parties entered into an agreement, which was entered "without prejudice to insurance year 2018." As part of this agreement, the Former Wife agreed to accept from the Former Husband $1,280 per month, although the policy she would purchase cost $1,480.03 per month and had a greater deductible and higher co-pays. In return, the Former Husband agreed to extend his required alimony payment by one month.

In October 2017, the Former Wife was notified that the 2018 premium for her health insurance plan, which included Dr. Franco and Aventura Hospital, would increase to $1,928.80 per month. She informed the Former Husband about the increase, but they could not reach an agreement. At that point, the Former Wife obtained a health insurance policy that costs approximately $1,400 per month, includes Dr. Franco and Aventura Hospital as "in-network" providers, and has a $6,000 annual deductible. The Former Wife then filed the Motion to Enforce.

At the April 6, 2018 hearing before the general magistrate, the Former Husband moved ore tenus for the Former Wife to submit a "[m]arketplace application so that we have every tool we need to make the decision here." The general magistrate granted the request and directed

the Former Wife to conduct a search for health insurance policies that included Dr. Franco but not Aventura Hospital.

On April 10, 2018, the Former Wife filed an affidavit as to her marketplace search along with an exhibit. The exhibit reflected monthly plan premiums ranging from $1,416 to $3,291.73, with varying deductibles.

On April 30, 2018, the general magistrate entered an Interim Report, stating in part:

> The question is not whether the Former Husband needs to pay for the wife's health insurance plan, he clearly does. The issue is what is a "reasonable plan."

The Magistrate found that when the Former Husband cancelled the Former Wife's policy through his office, she sought a replacement policy that listed Dr. Franco and Aventura hospital. The general magistrate agreed that it is reasonable for the Former Wife to limit insurance plans to those that accept Dr. Franco. The general magistrate directed the Former Wife to conduct a search on the healthcare marketplace for an insurance policy that includes Dr. Franco, but not to limit her search to any particular hospital, and to provide the results of the search to the Former Husband and the trial court. On May 16, 2018, the trial court entered an order ratifying, approving, and adopting the general magistrate's Interim Order.

7

The general magistrate conducted a second hearing on May 9, 2018. At the hearing, the Former Husband asserted that the marketplace quotes were more expensive because the Former Wife is a smoker, and it is not reasonable for her to charge him the increased rate due to her smoking habit. The Former Husband provided information as to a health maintenance organization ("HMO") plan for a non-smoker that has a large deductible but would allow the Former Wife to choose Dr. Franco as her primary care physician, and once the large deductible is met, the HMO plan would cover 100% of her claims. This HMO plan, including the amount of the deductible, would be $14,910 for the year. The Former Husband then proposed for the first time that there be an "escrow account" where he would deposit $5,350 (the annual deductible of the HMO, $7,350, minus $2,000) in an account that the Former Wife could use as needed once she had paid $2,000 in deductibles. The Former Wife's counsel disagreed with the implementation of an "escrow account" as such an account is not referenced in the MSA. The Former Wife's counsel argued that the majority of the plans in her marketplace exhibit are inferior to the plan that was in place when the parties entered into the MSA, and that the MSA provides for a plan that is "reasonably equivalent or comparable."

8

On June 19, 2018, the general magistrate entered its report. The report provides as follows:

There was no dispute as to whether the Former Husband is required to pay towards the Former Wife's health insurance plan. The issue for 2018 and future years, is what is a "reasonable plan." . . . .

. . . . The Court agreed that it was reasonable to limit insurance plans to those that accepted a physician with whom an individual had a long-term affiliation . . . . Therefore the Court directed the Former Wife to conduct a search through the health care marketplace (at the Former Husband's request) for an insurance policy that included her physician but was not limited as to which hospitals were in the plan.
. . . .

At the continued hearing on May 9, 2018, the Court heard additional testimony. The Former Husband indicated that he objected to paying for a "smoker's policy" although he acknowledged that the Former Wife smoked during the marriage. The Former Wife testified that she has smoked since high school.
. . . .

It was uncontested that the health insurance policy the Former Wife had at the time of the dissolution had a $2,000 deductible.

The Court, premised on all the evidence received and on the proffers and arguments presented, makes the following final findings:

**Health Insurance**

1. The Former Wife shall be responsible for the first $2,000 deductible under her insurance plan going forward and the Former Husband shall be responsible for the balance out of pocket medical expenses above $2,000.

9

2.   To implement this, the Former Husband shall deposit, from time to time as the policy changes, into an account owned and controlled by the Former Wife a sum equal to the then current plan deductible, less $2,000.  This sum is determined by taking the total deductible on the insurance policy and subtracting the $2,000 which is the sum that the Former Wife is responsible for paying. . . .

3.   The use of this "Deductible Account" is limited to medically necessary expenses that are uncovered by the insurance plan, and have not been re-imbursed to the Former Wife.

4.   The Former Wife shall maintain all receipts, bills, and invoices applicable to the deductible medical expenses.  If any dispute arises as to the propriety of the withdrawals, the Former Husband may, within 30 days of receipt of the expended amount, request an in-camera inspection by the Court of the expenditures from the prior year. . . .

   . . . .

8.   The Former Husband shall pay for 2018 (January through December) the sum of $1,300 per month representing his reasonable contribution towards monthly premiums for the Former Wife's health insurance policy for 2018. . . .

9.   For future years the premium obligation to be paid by the Former Husband to the Former Wife shall be arrived at by averaging the cost of the non-smoking premium for a PPO or EPO plan that includes Dr. Franco and the smoker premium for a PPO or EPO plan that includes Dr. Franco. . . .

10.   . . . . [The Former Husband has] an arrearage for health insurance obligation of $2,461.79 [for insurance paid December 15, 2017 through May 15, 2018]. . . .

   . . . .

10

**Life Insurance**

. . . .

13.  On February 14, 2018, the Former Husband added the Former Wife as a beneficiary to ½ the death benefits of a one million dollar life insurance policy he had taken out . . . .

. . . .

16.  The Former Husband shall maintain this life insurance policy and is enjoined from removing the Former Wife from her status as a 50% beneficiary of the $1,000,000 life insurance policy as long as he has any support obligation to her.

**Attorney's Fees**

17.  The Court finds that the Former Wife is entitled under the terms of the parties' agreement to an award of attorney's fees and costs.

The Former Husband filed exceptions, and the Former Wife filed cross-exceptions to the general magistrate's report dated June 19, 2018. On January 5, 2021, the trial court entered an order denying the Former Husband's exceptions and the Former Wife's cross-exceptions. The Former Husband's appeal, and the Former Wife's cross-appeal, followed.

## II.  STANDARDS OF REVIEW

An appellate court reviews the trial court's interpretation of a marital settlement agreement de novo.  Suess v. Suess, 289 So. 3d 525, 529 (Fla. 2d DCA 2019).  An appellate court reviews a trial court's ruling on a general

11

magistrate's report de novo. <u>Coriat v Coriat</u>, 306 So. 3d 356, 358 (Fla. 3d DCA 2020); <u>Lopez v. Dep't of Revenue</u>, 201 So. 3d 119, 123-24 (Fla. 3d DCA 2015).

## III. ANALYSIS

### A. Former Husband's Appeal

#### 1. General Magistrate's Entertainment of Motion to Enforce

The Former Husband contends that the general magistrate erred as a matter of law by entertaining the Former Wife's Motion to Enforce Final Judgment where the Final Judgment failed to expressly adopt or incorporate the parties' MSA, but merely referenced the MSA, noting that it had been filed in the lower tribunal on a specific date, and reserved jurisdiction to enforce the Final Judgment. Under the circumstances of this case, we disagree.

The issue raised by the Former Husband pertains to the trial court's "continuing jurisdiction" to entertain in the divorce proceeding the Former Wife's Motion to Enforce Final Judgment. <u>See</u> <u>Kozel v. Kozel</u>, 302 So. 3d 939, 945 (Fla. 2d DCA 2019) (explaining that "[s]ubject matter jurisdiction refers to a trial court's constitutional or statutory authority to decide a class of cases, while continuing jurisdiction refers to a trial court's jurisdiction to act in a case over which it had subject matter jurisdiction, but which it finally

12

resolved with the entry of a judgment"). In 2003, the Florida Supreme Court in Paulucci v. General Dynamics Corp., 842 So. 2d 797 (Fla. 2003), addressed the following rephrased question: "Does a court have jurisdiction to enforce a settlement agreement where the court has either incorporated the settlement agreement into a final judgment or approved the settlement agreement by order and retained jurisdiction to enforce its terms?" Id. at 799 (altered to lowercase). The Court answered the question in the affirmative. Id. The Court stated that in Davidson v. Stringer, 147 So. 228, 229 (Fla. 1933), it recognized that "[w]hen a judgment or decree has once been rendered, the court loses jurisdiction over the subject-matter of the suit, *other than to see that proper entry of judgment or decree is made and that the rights determined and fixed by it are properly enforced.*" Paulucci, 842 So. 2d at 800-01 (quoting Davidson, 147 So. at 229 (emphasis added in Paulucci)). Further, the Court recognized in Paulucci that in Levine, Middlebrooks, Mabie, Thomas, Mayers & Mitchell, P.A. v. United States Fire Ins. Co., 639 So. 2d 606 (Fla. 1994), it reaffirmed that "a trial judge has the inherent power to do those things necessary to enforce its order." Paulucci, 842 So. 2d at 801 (quoting Levine, Middlebrooks, 639 So. 2d at 608-09). The Paulucci Court held that, consistent with Davidson and Levine, Middlebrooks,

13

when a court incorporates a settlement agreement into a final judgment or approves a settlement agreement by order and retains jurisdiction to enforce its terms, the court has the jurisdiction to enforce the terms of the settlement agreement even if the terms are outside the scope of the remedy sought in the original pleadings. However, the extent of the court's continuing jurisdiction to enforce the terms of the settlement agreement is circumscribed by the terms of that agreement. Thus, if a party is claiming a breach of the agreement and is seeking general damages not specified in the agreement, the appropriate action would be to file a separate lawsuit.

Paulucci, 842 So. 2d at 803 (footnote omitted). The Supreme Court of Florida also noted:

By enforcing a contract, it is assumed that the contract has continuing validity and a party is ordered to comply with its terms. A breach of contract action presupposes that the contractual relationship is at an end because of a material breach by one party and damages are sought by the non-breaching party as a substitute for performance.

Paulucci, 842 So. 2d at 803 (approving of this particular language from General Dynamics Corp. v. Paulucci, 797 So. 2d 18, 20 (Fla. 5th DCA 2001)).

In 2019, in Kozel v. Kozel, 302 So. 3d 939 (Fla. 2d DCA 2019), the Second District Court of Appeal addressed a trial court's continuing jurisdiction to enforce a settlement agreement in a dissolution of marriage proceeding following the entry of final judgment. The Second District noted that the former wife's filings were styled as petitions to enforce the settlement agreement, but in reality, the filings "amounted to claims for

14

money damages for alleged breaches of contract." Id. at 941. In reversing the family court's award of damages to the former wife, the Second District held: "A trial court's continuing jurisdiction to enforce a settlement agreement generally does not include jurisdiction to award damages for breach that are not specified in the agreement, and the agreement here did not specify the damages the former wife sought and the family court awarded." Id.

Here, the trial court did not explicitly "incorporate" the parties' MSA into the Final Judgment by either using such terms as "ratify," "approve," or "adopt"; attaching the MSA as an exhibit to the Final Judgment; or ordering the parties to obey the terms of the MSA. Therefore, it could be argued that the trial court does not have continuing jurisdiction to enforce the MSA. However, despite the lack of such explicit terms or language, the trial court incorporated the MSA into the Final Judgment by specifically stating that it reviewed the court file, and by referring to the MSA by the date it was entered into by the parties and the date it was filed in the lower tribunal docket. Further, the identified MSA provides in Paragraph 14(c) that the "parties further agree that the Court will retain jurisdiction over the subject matter and the parties hereto, for the purpose of enforcing the terms of this Separation and Settlement Agreement." The parties clearly anticipated that

15

the trial court would retain continuing jurisdiction to enforce the terms of the MSA. Under these circumstances, the trial court incorporated the MSA into the Final Judgment by reference, and therefore, it has continuing jurisdiction to entertain the Former Wife's Motion to Enforce Final Judgment. Finally, there would have been no need for the trial court to reserve jurisdiction to enforce the Final Judgment if the MSA was not "incorporated" by reference into the Final Judgment because the only provisions that could possibly need enforcement in the future were the provisions relating to the MSA.

2. _Motion to Enforce v. Motion to Modify under section 61.14_

The Former Husband further argues that, rather than filing the Motion to Enforce Final Judgment, the Former Wife should have filed a motion to modify alimony under section 61.14 of the Florida Statutes. We disagree.

In family law cases, a trial court has continuing jurisdiction to modify an alimony award under section 61.14 even when a settlement agreement is not incorporated into the final judgment. See Frizzell v. Bartley, 372 So. 2d 1371, 1372 (Fla. 1979) (holding that section 61.14 allows a modification of alimony although the parties' agreement was not incorporated into the divorce decree).

16

Here, the Former Wife was not seeking to modify alimony but to enforce the health insurance provision (Paragraph 6.h.i-ii) of the MSA. The health insurance provisions obligated the Former Husband to continue to provide the Former Wife with health insurance through his law firm "under the current plan or a reasonably equivalent and comparable plan." The MSA addressed the Former Husband's obligation if such a health insurance plan was no longer available through the Former Husband's law firm—the Former Husband's "support obligation will be increased equal to the pro rata charge for insurance applicable to Marcy as of July, 2012 or the reasonable cost for Marcy to obtain cover, **whichever is greater**." (emphasis added). Contrary to the general magistrate's interim report, the required "cover" provided for in the MSA was "a reasonably equivalent and comparable plan," not merely a "reasonable" plan. Although the Former Husband's continued health insurance obligation to the Former Wife results in an increase in the Former Husband's support obligation, the Former Wife is seeking to enforce the MSA, not to modify alimony.

3. *Enforcement of MSA*

**a. Requiring the Former Husband to provide a plan that includes as an "in network" provider the Former Wife's primary care physician**

17

The Former Husband argues that the general magistrate unlawfully modified the MSA by requiring the Former Husband to provide a health insurance plan that included the Former Wife's primary care physician as an "in network" provider. We agree.

A marital settlement agreement is a contract, and its unambiguous language is to be interpreted according to its plain meaning. See Lentz v. Cmty. Bank of Fla., Inc., 189 So. 3d 882, 886 (Fla. 3d DCA 2016) (holding that where provisions in a settlement agreement are unambiguous, a court may not modify the terms); Rector v. Rector, 264 So. 3d 282, 286 (Fla. 2d DCA 2019). "Although a trial court may be motivated to do what it considers to be fair and equitable, it retains no jurisdiction to rewrite the terms of a marital settlement agreement." See Rocha v. Mendonca, 35 So. 3d 973, 976 (Fla. 3d DCA 2010).

Pursuant to the health insurance provision in the MSA, the Former Husband was obligated to continue to provide health insurance to the Former Wife under the plan that was in place in 2012 when the MSA was entered into or "a reasonably equivalent and comparable plan." Here, when the MSA was entered into, the Former Wife's health insurance was a PPO plan with a $2,000 deductible, with various "in-network" providers. The MSA does not require that the "reasonably equivalent and comparable

18

plan" must include the same "in network" providers or that the plan must include Dr. Franco as an "in network" provider. The Former Wife contended that the Former Husband allegedly promised her that she would be able to continue seeing Dr. Franco. That alleged promise, however, was not incorporated into the MSA. As such, the general magistrate rewrote the terms of the MSA.

### b. Requiring Former Husband to pay a portion of the increased premium due to Former Wife's smoking history

The Former Husband argues that the general magistrate unlawfully modified the MSA by requiring him to pay a portion of the difference between a policy for a person with a smoking history and a person without a smoking history. We agree, but conclude that based on the language in the MSA, the Former Husband is the one who is obligated to pay the entire increased premium.

As a result of the Former Wife's smoking history, her health insurance is more costly. The trial court attempted to remedy the situation by ordering that, "[f]or future years the premium obligation to be paid by the Former Husband to the Former Wife shall be arrived at by averaging the cost of the non-smoking premium for a PPO or EPO plan that includes Dr. Franco and the smoker premium for a PPO or EPO plan that includes Dr. Franco." The Husband argues that by doing so, the trial court has modified

19

the MSA, and that he should not be obligated to pay any of the increased premium due to the Former Wife's smoking history. We agree with the Former Husband's argument that the general magistrate modified the MSA, but based on the unambiguous language of the MSA, the Former Husband is the one who is obligated to pay the entire increased premium, not the Former Wife.

In its findings of fact, which were adopted by the trial court, the general magistrate found that the Former Husband acknowledged that the Former Wife was a smoker during the marriage, and she testified that she has smoked since high school. Although not mentioned by the general magistrate, the Husband's testimony reflects that the Former Wife did not continuously smoke throughout the marriage and apparently stopped for a five-year period towards the end of the marriage. Nonetheless, it appears that she smoked for considerable parts of the marriage. When the parties entered into the MSA, the health insurance plan that the Former Wife was insured under covered smokers. The general magistrate erred by rewriting the terms of the MSA to accomplish what it believed was fair and equitable. See Rocha, 35 So. 3d at 976 ("Although a trial court may be motivated to do what it considers to be fair and equitable, it retains no jurisdiction to rewrite the terms of a marital settlement agreement."). The MSA requires

20

the Former Husband to provide a reasonably equivalent and comparable health insurance plan, and the trial court was tasked with implementing the remedy provided with the MSA—the amount of his "support obligation will be increased equal to the pro rata charge for insurance applicable to Marcy as of July, 2012 or the reasonable cost for Marcy to obtain cover, **whichever is greater**." (emphasis added). The general magistrate, therefore, erred by rewriting the terms of the MSA by requiring the Former Wife to pay for a portion of the increased premium due to her smoking history.

### c. Requiring Former Husband to maintain current life insurance policy

The Former Husband argues that the general magistrate unlawfully modified the MSA by providing that he must maintain his current life insurance policy. We agree.

The Former Husband does not dispute that he is obligated to maintain a life insurance policy in the amount of $500,000, naming the Former Wife as the beneficiary until his support obligations end. However, he contends that the general magistrate modified the terms of the MSA by requiring that he maintain the current policy—"The Former Husband shall maintain **this** life insurance policy and is enjoined from removing the Former Wife from her status as a 50% beneficiary of the $1,000,000 life

insurance policy as long as he has any support obligation to her." (emphasis added). This argument has merit. The MSA merely requires him to provide a $500,000 life insurance policy naming the Former Wife as the primary beneficiary until his support obligations terminate. As long as there are no gaps in coverage between the Former Husband's current policy and any future policy, the Former Husband has the option to obtain another life insurance policy that conforms with his obligations under the MSA.

### 4. Attorney's fees

The Former Husband's argument relating to the determination that the Former Wife is entitled to attorney's fees is not ripe for appellate review because an order determining the amount of fees has not been entered. See Garcia v. Valladares, 99 So. 3d 518, 518 (Fla. 3d DCA 2011) (holding that because the attorney's fees entitlement order "does not determine the amount of such fees or costs, the order is a non-final, non-appealable order").

The remaining arguments raised by the Former Husband are either moot as a result of our determination of the issue raised by the Former Wife on cross-appeal and/or lack merit.

### B. Former Wife's Cross-Appeal—"Deductible Account"

The Former Wife argues that the trial court modified the MSA by requiring the parties to implement a Deductible Account where such an account was not contemplated by the MSA or framed by any of the pleadings.  We agree.

At the second hearing, the Former Wife argued that a policy that is reasonably equivalent and comparable to the policy she had in 2012 when the MSA was entered into would cost $2,618.70 per month.  The parties acknowledged that in 2012 the Former Wife's deductible was $2,000.  However, in an attempt to lower his monthly cost, the Former Husband suggested that the Former Wife accept a plan with a much higher deductible, and that he fund an account, which he referred to as an "escrow" account, with the difference between the higher deductible and $2,000, which funds can be utilized by the Former Wife after she reaches the $2,000 deductible.

The general magistrate accepted the Former Husband's suggestion, and ordered the Former Husband to pay the Former Wife $1,300 per month for a policy that has a $7,300 deductible.  The general magistrate calculated the $1,300 monthly cost based on the average cost of a policy for a tobacco user and a non-tobacco user.

23

As stated earlier, the MSA anticipated the situation at hand and set forth a remedy. The remedy did not include this "Deductible Account." Further, the creation of this account would also place certain burdens on the Former Wife that were not contemplated by the MSA—in the event the Former Husband challenged any of the Former Wife's withdrawals, the burden would be on the Former Wife, during an in-camera review, to support her withdrawals. It appears that the general magistrate once again improperly rewrote the parties' MSA in an attempt to fashion a result that it believed was fair and equitable. See Rocha, 35 So. 3d at 976; Suess, 289 So. 3d at 529-30 (holding that a court is powerless to rewrite a marital settlement agreement "to make it more reasonable or advantageous for one of the contracting parties") (quoting Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000, 1003 (Fla. 2d DCA 1995)); Ferguson v. Ferguson, 54 So. 3d 553, 556 (Fla. 3d DCA 2011) ("A trial court is not authorized to intervene to ameliorate a hardship that a promisor, such as the former husband in this case, could have thus avoided."); see also Platinum Luxury Auctions, LLC v. Concierge Auctions, LLC, 227 So. 3d 685, 688 (Fla. 3d DCA 2017) ("An order enforcing a settlement agreement must conform with the terms of the agreement and may not impose terms

24

that were not included in the agreement.") (quoting <u>Johnson v. Bezner</u>, 910 So. 2d 398, 401 (Fla. 4th DCA 2005)).

## IV. CONCLUSION

Based on the above analysis, we affirm in part and reverse in part, the trial court's order denying the Former Husband's exceptions and the Former Wife's cross-exceptions to the general magistrate's interim report and report, and remand for the entry of an order or orders consistent with this opinion. Further, on remand, if necessary, an evidentiary hearing may be conducted to determine the amount of a "reasonably equivalent and comparable plan."

Affirmed in part; reversed in part; and remanded with instructions.